RODOLFO MURPHY BERNABE, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. JUEZ HÉCTOR COLÓN CRUZ, demandado; JUNTA DE PLANIFICACIÓN DE PUERTO RICO, interventora. JUNTA DE APELACIONES SOBRE CONSTRUCCIONES Y LOTIFICACIONES, peticionaria y recurrida, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE SAN JUAN, HON. JUEZ HÉCTOR COLÓN CRUZ, demandado; FEDERACIÓN DE MÚSICOS DE PUERTO RICO (recurrente), RODOLFO MURPHY BERNABE Y JUNTA DE PLANIFICACIÓN DE PUERTO RICO, interventores.

*Números:* O-72-205    *Resueltos:* 18 de abril de 1975
            O-72-214

---

*Waldo Santiago Irizarry, Carlos Santos Correa* y *Luis E. López Correa,* abogados de la Junta de Apelaciones y Lotificaciones; *Germán W. Colberg,* abogado de Rodolfo Murphy Bernabe; *Josephine Hernández Peña,* abogada de la Federación de Músicos de Puerto Rico; *Benjamín Soto Maldonado, Marcos A. Rodríguez Estrada, Gregui J. Mercado* y *Rafael Vega Figueroa,* abogados de la Junta de Planificación de Puerto Rico.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

El 2 de abril de 1969 la Oficina Regional de San Juan de la Junta de Planificación de Puerto Rico emitió un informe en que autorizó un anteproyecto de la Federación de Músicos de Puerto Rico para la construcción de un edificio de dos plantas y un sótano en un distrito clasificado C-1, contiguo a la urbanización residencial University Gardens de Río Piedras. El propuesto edificio tendría como uso principal el alber-gue de las oficinas de la Federación, y proveería en el sótano para cuartos de máquinas, áreas de uso común y salón de descanso y merienda; cinco salones de ensayo o práctica para músicos en la primera planta, y oficinas en la segunda planta. También haría reserva de un área para estacionamiento de automóviles. El informe fue aprobado por la Oficina Regional

con la objeción del señor Rodolfo Murphy Bernabe y otros residentes de la urbanización, quienes, inconformes, apelaron a la Junta de Apelaciones sobre Construcciones y Lotificaciones. La Junta de Apelaciones celebró vistas, oyó testigos, y finalmente emitió resolución confirmatoria del informe, pero modificado para eliminar el permiso de construcción y uso de los salones de ensayo. Concluyó la Junta de Apelaciones que los salones de ensayo o práctica para los músicos no constituyen un uso accesorio al uso principal para oficinas permitido en un distrito C-1. La Federación recurrió al Tribunal Superior, Sala de San Juan, al amparo del Art. 26 de la Ley Núm. 213 de 12 de mayo de 1942, 23 L.P.R.A. sec. 28, para revisar dicha resolución. El 20 de marzo de 1972 el Tribunal Superior dictó sentencia en que revocó la resolución de la Junta de Apelaciones y confirmó la decisión de la Oficina Regional de la Junta de Planificación.

■ Murphy y la Junta de Apelaciones acudieron ante nos por separado, mediante sendas solicitudes de *certiorari*. Consolidamos ambos recursos y así hemos de resolverlos. Se nos plantea si fue correcta la decisión de la Junta de Apelaciones al concluir que los salones de ensayo no constituyen un uso accesorio al uso principal propuesto y si la Junta de Apelaciones puede ser parte, es decir, si tiene capacidad para comparecer ante nosotros a sostener su dictamen. Resolvemos que debe sostenerse el fallo de la Junta de Apelaciones. Por otra parte, siendo la función de la Junta de Apelaciones en este caso una de carácter cuasi judicial, y no estando autorizada por la ley que la crea para ser parte en recursos judiciales en que se revisa una decisión suya, no podemos reconocerle esa capacidad. Examinemos ambas cuestiones separadamente.

I

El "Nuevo Reglamento de Zonificación" promulgado el 13 de julio de 1955 permitía que en distritos C-1 se construyeran edificios como los permitidos en cualquier distrito residencial,

autorizándose además que la primera planta pudiera dedicarse a los siguientes usos: establecimientos o tiendas para comercio al detal de artículos de consumo o uso corriente del hogar, establecimientos para servicios personales, oficinas, barberías y salones de belleza, panadería y repostería para ventas al detal, reparación y limpieza de zapatos, sastrerías, lavanderías, determinadas actividades industriales, estaciones para recolección y distribución de ropas y materiales para limpieza y tintorería, áreas de estacionamiento para vehículos livianos, restaurantes y cafeterías, cinematógrafos, sucursales de casas bancarias, puestos de gasolina y estaciones para ómnibus y carros públicos y taxímetros. El inciso (18) reglamentaba los rótulos permitidos y el (19) permitía usos "accesorios a cualquier fin principal permitido" y concluía diciendo: "No obstante la disposición en cuanto a uso de las plantas sobre la primera, se permitirá el uso de la segunda planta para oficinas, barberías, salones de belleza y usos accesorios a la actividad principal permitida en la primera planta."

La relación que dejamos hecha de los usos autorizados o que la Junta de Planificación podía autorizar en virtud del Art. 50.00 claramente sugiere que se pensó permitir tales establecimientos y actividades en distritos C-1 para beneficiar a las familias residentes de esos distritos y de distritos residenciales vecinos. El llamado "Nuevo Reglamento de Zonificación" que, según hemos indicado, regía cuando se suscitó la cuestión que nos ocupa ante la Oficina Regional de San Juan, fue sustituido por otro que ahora rige, promulgado el 7 de enero de 1970, que recoge el expresado propósito en su Sec. 13.01, 23 R.&R.P.R. sec. 9–201, así: "Este distrito [C-1] se establece para clasificar áreas comerciales para crear nuevas áreas que suplan las necesidades diarias de las personas que residen en el vecindario."

Parece dudoso que el uso principal—oficinas—a que ha de destinarse el edificio propuesto por la Federación de Músicos supla "las necesidades diarias de las personas que residen en

el vecindario," a menos que tales personas sean miembros de la Federación. El edificio podrá ser útil y necesario para los músicos pero no necesariamente para todos los residentes del vecindario, como lo serían los establecimientos y actividades que relacionaba el Art. 50.00 del reglamento que antes regía. Por supuesto, no está ante nuestra consideración la corrección de la decisión de la Oficina Regional que autoriza la ubicación del edificio en sí para dedicarlo a oficinas como uso principal. Además, la expresión del propósito de la clasificación C-1 en la forma en que aparece articulada en la Sec. 13.01 del Reglamento ahora vigente no aparecía expresamente enunciada en el anterior Reglamento y no habría base para intervenir con la discreción ejercitada tanto por la Oficina Regional como por la Junta de Apelaciones al autorizar la primera y confirmar la segunda el uso principal propuesto para el edificio.

El Tribunal Superior basó principalmente su decisión en tres consideraciones, a saber: (a) que el Art. 50.00 del Reglamento de 1955, entonces vigente, permitía en un distrito C-1 cualquier uso permitido a su vez en un distrito R-1, entre los que se mencionaba edificios para clubes cívicos de fines no pecuniarios, teniendo a su juicio la Federación de Músicos el carácter de un club cívico: (b) que dicho Art. 50.00 permitía de igual manera hoteles de turismo, hospitales de animales, y otras actividades que deben ser más perturbadoras de un vecindario residencial que unas salas de ensayo preparadas acústicamente para que el ruido de los instrumentos no trascienda del edificio; y, (c) que las salas de ensayo son usos accesorios al uso principal del edificio como sede de las oficinas de la Federación de Músicos.

La determinación de si la Federación de Músicos de Puerto Rico participa de la naturaleza de una organización cívica o fraternal sin fines pecuniarios carece de importancia en este caso. Ante el Tribunal Superior no se planteó, ni se plantea ante nos, conforme ya hemos indicado, si la Federación podía ser autorizada a ubicar su edificio para oficinas en

el distrito C-1 contiguo a la Urbanización University Gardens. Adjudicado que podía ubicarlo allí, embarcarse en consideraciones sobre la base de la autorización resulta en un bizantinismo.

En cuanto a hoteles, hospitales para animales, estudios de radio y televisión y actividades análogas, perdió de vista el tribunal sentenciador que si bien tales usos estaban autorizados en un distrito R-1, fueron expresamente prohibidos para los demás distritos R y para el C-1 por el Art. 25.00 del Reglamento. Perdió de vista además que aun respecto de un distrito R-1 la autorización de tales usos estaba sujeta a la aprobación de la Junta de Planificación. En otras palabras, había usos en los distritos R-1 que el Reglamento autorizaba, como eran las casas de una familia, ocupaciones domiciliarias como uso secundario al residencial, casas de huéspedes, jardines o huertos, etc., y que la Junta de Planificación no podía prohibir si cumplían otros requisitos reglamentarios aplicables, y había usos, como la ubicación de hoteles, hospitales de animales, estudios de radio y televisión, etc., que dicha Junta podía aprobar en el ejercicio de su discreción. En este último grupo se incluían los edificios para clubes cívicos.

■ Finalmente, y en cuanto a que las salas de ensayo sean un uso accesorio al propósito principal del edificio, pasó por alto el tribunal recurrido que se trata de la determinación de un hecho—no es una cuestión de Derecho—que competía hacerla al organismo administrativo. El Art. 26 de la Ley Núm. 213 de 12 de mayo de 1942, 23 L.P.R.A. sec. 28, según enmendado, establece el procedimiento de apelación de las decisiones de la Junta de Planificación a la Junta de Apelaciones creada por dicha ley, y establece además el procedimiento de revisión judicial de las decisiones de la Junta de Apelaciones. Dispone el citado artículo en su inciso (f):

"(f) La revisión ante el Tribunal Superior se limitará exclusivamente a cuestiones de Derecho."

El uso accesorio era definido en el Art. 1.00, inciso (62)

del Reglamento de 1955 como: "Cualquier uso que se dé a la pertenencia, que sea secundario a su uso principal, para aquellos propósitos comúnmente incidentales y que se relacionen con dicho uso principal." El Reglamento promulgado en 1970 define uso accesorio, en su Sec. 2.43, 23 R.&R.P.R. sec. 9–11(43) así: "Cualquier uso que se dé a la pertenencia, que sea secundario a su uso principal."

La Junta de Apelaciones, en el desempeño de una función cuasi judicial, celebró vistas y recibió prueba testifical y documental que evaluó, y a base de su evaluación concluyó que los salones de ensayo no constituyen un uso accesorio, es decir, secundario y comúnmente incidental, al uso principal del edificio como uno para oficinas. No siendo irrazonable dicha determinación el tribunal recurrido no debió sustituirla por su propio enfoque sobre los hechos. *Comisión Servicio Público* v. *Metro Taxicabs*, 82 D.P.R. 999 (1961); *Colón* v. *San Patricio Corporation*, 81 D.P.R. 242 (1959); *López* v. *Junta Planificación*, 80 D.P.R. 646 (1958); *Mejías, Admor.* v. *Tribunal Superior*, 75 D.P.R. 447 (1953); *Ledesma, Admor.* v. *Tribunal de Distrito*, 73 D.P.R. 396 (1952). Reiteradamente hemos sostenido que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto y que su revisión judicial se limita a determinar si la agencia actuó arbitraria o ilegalmente o en forma tan irrazonable que su actuación constituyó un abuso de discreción. *Reyes* v. *Junta Planificación*, 79 D.P.R. 620 (1956); *Quevedo Segarra* v. *J.A.C.L.*, 102 D.P.R. 87 (1974); *Román* v. *Superintendente de la Policía*, 93 D.P.R. 685 (1966); *Monllor & Boscio* v. *Comisión Industrial*, 89 D.P.R. 397 (1963); *Seashore Realty, etc. Co.* v. *Junta*, 75 D.P.R. 142 (1953); *Rodríguez* v. *Comisión Industrial*, 99 D.P.R. 368 (1970). Las decisiones administrativas tienen a su favor la presunción de legalidad y corrección. *Asoc. D.C.V.P* v. *Tribunal Superior*, 101 D.P.R. 875 (1974); *P.R.*

*Tel. Co.* v. *Tribunal Superior*, 102 D.P.R. 231 (1974). Esa presunción no ha sido rebatida en este caso.

En este caso la Oficina Regional de San Juan decidió en un breve informe que los salones de ensayo propuestos por la Federación constituyen un uso accesorio al propósito principal del edificio. La Junta de Apelaciones, luego de cumplir todos los trámites investigativos de rigor, en una extensa y bien fundamentada resolución, concluyó que como cuestión de hecho no es así. No se nos ha demostrado que actuara caprichosamente y sin base en la prueba que tuvo ante sí. Su decisión debe prevalecer.

## II

La Junta de Planificación impugna la capacidad de la Junta de Apelaciones para solicitar la revisión de la decisión del Tribunal Superior. Suscita con ello el problema que en las jurisdicciones estatales norteamericanas llaman *standing*, es decir, la facultad en Derecho para comparecer y abogar como parte. Sobre este particular hay diversidad de criterios.

Se ha sostenido en los Estados de Oklahoma, Connecticut, Tejas, Nuevo Méjico y Missouri que, como las juntas y comisiones administrativas tienen la obligación de poner en vigor la política pública del Estado, tienen por tanto interés en que se sostengan sus decisiones. Se señala, además, que debido a su especialización están en mejor posición que las partes para defender el interés público. Por ejemplo, se resolvió en *Board of Commissioners* v. *Woodford School District*, 165 Okl. 227, 25 P.2d 1057 (1933), que como el público tiene interés en el establecimiento de distritos escolares, la Junta de Comisionados del Estado, como representante del público, es parte interesada y perjudicada por las decisiones judiciales contrarias a sus dictámenes y tiene derecho a apelar de ellas. Al mismo efecto, véanse *Board of Adjustment* v. *Stovall*, 147 Tex. 366, 216 S.W.2d 171 (1949), y *González* v. *New Mexico State Board*, 63 N.M. 13, 312 P.2d 541 (1957). Se dijo en *Dubinsky*

*Brothers* v. *Industrial Commission,* 373 S.W.2d 9 (Mo. 1963) que la Comisión Industrial de Missouri, por su interés en proteger sus propias decisiones, "es parte perjudicada y tiene capacidad" para solicitar la revisión de una decisión judicial adversa. El profesor Jaffe en su obra *Judicial Control of Administrative Action,* ed. 1965, pág. 537, se inclina a favor de esta posición.

■ Por otra parte, los más recientes casos parecen favorecer la posición que le niega autoridad a las juntas y comisiones administrativas para convertirse en partes activas defensoras de sus decisiones ante los tribunales cuando actúan en una capacidad cuasi judicial. En *Muench* v. *Public Service Commission,* 261 Wis. 492, 53 N.W.2d 514, 523 (1952) se dijo:

"Sostener que la Comisión de Servicio Público debe no solamente decidir entre intereses conflictivos en el ejercicio de su función judicial, sino también representar al Estado en protección de los derechos públicos, haría de la Comisión juez y parte a un tiempo. Tal concepto viola nuestro sentido de lo justo y del debido proceso que creemos deben ser siempre observados por las agencias administrativas que actúan en una capacidad cuasi judicial."

Añade el profesor Davis (3 Davis, *Administrative Law Treatise,* sec. 22.15): "La Comisión puede proteger el interés público sin asumir el papel de quien advoca; más aún, la Comisión puede encargar a sus asesores para que asuman la función de abogados si ello fuere deseable." Señala Davis que en Maryland, Ohio y Pennsylvania una junta de ajustes de zonificación no tiene capacidad para apelar de la decisión de un tribunal de instancia que revoca una orden de la junta. En el mismo sentido se decidió en *Hassell* v. *Zoning Board of Review,* 275 A.2d 646 (R.I. 1971); *Board of Zoning Appeals* v. *Guns,* 269 A.2d 833 (Md. 1970); *Minnesota Water Resources Board* v. *County of Traverse,* 287 Minn. 130, 177 N.W.2d 44 (1970); *Maryland Board of Pharmacy* v. *Peco,* 234 Md. 200, 198

A.2d 273 (1964), citando *Miles* v. *McKinney*, 174 Md. 551, 199 A. 540 (1938).

La cuestión no ha sido resuelta expresamente en nuestra jurisdicción. En *Deliz* v. *Junta de Apelaciones*, 71 D.P.R. 138 (1950), se planteó si un Oficial de Permisos de la Junta de Planificación era "una parte directamente interesada" a los fines de poder recurrir al foro judicial de una decisión de la Junta de Apelaciones. Se resolvió que no lo era y que por tanto no tenía "capacidad legal" para establecer el recurso. Se señaló, página 141 que, una vez apelado el caso para ante la Junta, desaparece de la escena el Oficial de Permisos. Se dijo: "En tales circunstancias, somos de opinión que las únicas partes interesadas en el recurso ante el Tribunal son aquellas que se consideran directamente perjudicadas por la decisión de la Junta de Apelaciones sobre Construcciones, y no siendo el Oficial de Permisos una parte directamente perjudicada por la decisión de la Junta, carece de capacidad legal para establecer el recurso."

Como puede colegirse tanto de nuestra decisión en *Deliz* como de las decisiones de los Estados que reconocen el llamado *standing* a las juntas y comisiones cuasi judiciales, lo determinante ha sido si el funcionario o la junta o comisión es "parte interesada y perjudicada."

En la jurisdicción federal de los Estados Unidos la cuestión de *standing* ha sido algo confusa. El propio Tribunal Supremo ha dicho que es "una especialidad complicada de la jurisdicción federal." Véase *United States ex rel. Chapman* v. *F.R.C.*, 345 U.S. 153, 156 (1953). Señala Davis en su obra antes citada, suplemento de 1970, pág. 703, que en cuatro decisiones que él llama "los cuatro casos claves",[1] dos de 1968 y dos de 1970, el Tribunal le ha dado una nueva orientación básica al asunto, enfocada hacia una mayor liberalidad. Antes de esas decisiones se predicó la capacidad legal o *standing* a base de conceptos tales como "parte interesada," "parte

perjudicada," "parte con derecho legal," y otros. Davis, *op. cit.*, *supra*. Los llamados cuatro casos claves preconizan la doctrina de que todo el que de hecho sufra un daño (*injury in fact*) tiene *standing*.

■ Resumiendo, en ausencia de una expresa autorización estatutaria, se reconoce capacidad como parte a los organismos administrativos: (1) cuando sus decisiones implican la formulación de una política pública y la revisión de su decisión ante un tribunal puede constituir un ataque a esa política pública; y (2) cuando el organismo es afectado, es "parte interesada y perjudicada" por la decisión de un tribunal que revisa sus actuaciones.

Ninguna de esas circunstancias está aquí presente. Aquí la Junta de Apelaciones entendió en y decidió una controversia entre, de una parte, el señor Murphy Bernabe y otros residentes de una urbanización, y de otra parte la Federación de Músicos. La controversia fue decidida en primera instancia por la Oficina Regional de la Junta de Planificación a favor de la Federación. En apelación, la Junta de Apelaciones modificó la decisión apelada, limitando el permiso de construcción del edificio a construirse por la Federación de Músicos para excluir las salas de ensayo. Su decisión fue estrictamente cuasi judicial.

La Junta de Planificación es el organismo creado por ley para llevar a cabo la política pública del Estado, 23 L.P.R.A. sec. 1 *et seq.* y es por tanto el organismo con capacidad para comparecer como parte a defender sus decisiones. La autoridad de la Junta de Apelaciones está limitada a revisar actuaciones o resoluciones de la Junta de Planificación sobre "la expedición o denegación de un permiso de construcción, sanitario o de uso de terrenos o edificios y sobre casos o planos de lotificaciones simples", 23 L.P.R.A. sec. 28. Al así actuar, la

---

(1)*Harding* v. *Kentucky Util. Co.*, 390 U.S. 1 (1968); *Flast* v. *Cohen*, 392 U.S. 83 (1968); *Association of Data Processing Serv. Organizations* v. *Camp*, 397 U.S. 150 (1970), y *Barlow* v. *Collins*, 397 U.S. 159 (1970).

Junta de Apelaciones desempeña una función cuasi judicial.

La revisión de las decisiones de la Junta de Apelaciones está regida por las siguientes disposiciones de la Ley de Planificación y Presupuesto, en su Art. 26, 23 L.P.R.A. sec. 28:

"(d) Cualquier parte afectada por una actuación o resolución de la Junta de Apelaciones, en relación con la cual una petición de reconsideración hubiere sido formulada y denegada, podrá establecer recurso de revisión ante la Sala de San Juan del Tribunal Superior de Puerto Rico, dentro del término de treinta (30) días contados a partir de la fecha del depósito en el correo de la notificación de la denegatoria de la solicitud de reconsideración.

(e) Establecido el recurso de revisión, si se expide auto al efecto, será deber de la Junta de Apelaciones elevar al Tribunal los autos del caso, dentro de los quince (15) días siguientes a la expedición del auto.

(f) La revisión ante el Tribunal Superior se limitará exclusivamente a cuestiones de derecho."

Esas disposiciones no facultan a la Junta de Apelaciones para ser parte en el proceso de revisión de sus decisiones. Hay estados federados en que la ley creadora de la junta le otorga esa facultad. Tal es la situación en Wisconsin. Véanse *Kansas Town of Ashwaubenon* v. *Public Service Commission,* 113 N.W.2d 412 (Wis. 1962); *Warburton* v. *Warkentin,* 345 P.2d 992 (Kan. 1959). Esa no es la situación en Puerto Rico. Como se sostuvo en *Re Getsug,* 186 N.W.2d 686 (Minn. 1971), en ausencia de autorización estatutaria, la junta carece de capacidad legal como parte.

█ La cuestión de capacidad legal de las partes plantea un problema de jurisdicción. El Tribunal Supremo federal dijo en *United States* v. *Storer Broadcasting Co.,* 351 U.S. 192, 197 (1956): "Aunque el derecho del demandado a apelar no ha sido cuestionado por las partes ni se suscitó ante la Corte de Apelaciones, podemos considerar si tenemos jurisdicción. La jurisdicción depende de si hay capacidad legal para solicitar revisión y sobre la madurez del asunto para estar ante

nos." (²) Es principio inveterado de Derecho que la jurisdicción la da la ley. Y sobre este particular, la ley que creó la Junta de Apelaciones, guarda silencio.

*Se anulará el auto expedido en el caso O-72-214 a instancias de la Junta de Apelaciones sobre Construcciones y Lotificaciones. En cuanto al caso O-72-205, en que expedimos el auto a instancias de Murphy Bernabe, se revocará la sentencia del Tribunal Superior, Sala de San Juan, quedando en todo su efecto y vigor la resolución de la Junta de Apelaciones.*

El Juez Asociado Señor Rigau disiente en parte y concurre en parte en opinión separada en que concurren el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Díaz Cruz. El Juez Asociado Señor Martín concurre en opinión separada con el resultado.

—O—

Opinión concurrente en parte y disidente en parte del Juez Asociado Señor Rigau con la cual concurren el Juez Presidente Señor Trías Monge y el Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 18 de abril de 1975.

Se plantea en estos casos si la Junta de Apelaciones sobre Construcciones y Lotificaciones tiene capacidad jurídica (*standing*) para recurrir a este Tribunal solicitando la revisión de una decisión del Tribunal Superior que ha sido adversa a una determinación suya.

La opinión mayoritaria resuelve dos cosas: (1) A instancia de parte privada, revoca al Tribunal Superior y restituye la decisión de la Junta y (2) declara que la Junta no tiene capacidad jurídica para los fines antes dichos en el primer párrafo de esta opinión. Concurro con lo primero, expresado

---

(²) El texto inglés dice: "While the question of respondent's right to appeal has not been raised by either party or by the Court of Appeals, our jurisdiction is now mooted. It may be considered. . . . Jurisdiction depends upon standing to seek review and upon ripeness."

muy cuidadosamente en la mayoritaria; y, con todo respeto para otros criterios, disiento de los segundo.

Las agencias, corporaciones y demás organismos públicos son los instrumentos mediante los cuales se lleva a cabo la política pública del país, según declarada por el Legislativo y por el Ejecutivo en las leyes. [1]

En oposición al litigante privado, que generalmente representa su interés personal, económico y egoísta, los organismos públicos generalmente representan el interés general, el bien común. No me parece una buena regla la que permitiría que ante los tribunales lleguen toda clase de planteamientos privados, desde los más justos y respetables hasta los más egoístas y frívolos y, que por el contrario, le cerrase las puertas de la justicia a los organismos públicos que representan el bien común.

Sé que la jurisprudencia de los Estados Unidos está dividida sobre el particular pero hecho tan común y tan intrascendente no debe paralizar nuestro pensamiento. Después de todo, el derecho administrativo en aquel país es joven, crudo y fragmentario. Prácticamente ha crecido en una sola dirección: cómo controlar judicialmente la administración pública; y, muchas veces, cómo frustrarla. Con raras excepciones, no se ha preocupado por sus fundamentos, por su razón de ser y por su desarrollo legítimo y balanceado. Esto es así porque generalmente abogados y jueces en aquel país han creído erró-

[1] Friedrich, *El Hombre y el Gobierno*, Editorial Tecnos, Madrid (1968), Cap. 26; del mismo autor, *Constitutional Government and Democracy*, 4ta. ed. (1968), Caps. 2 y 19. Para un excelente tratado puertorriqueño sobre la materia, patrocinado por las Naciones Unidas, véanse Muñoz Amato, *Introducción a la Administración Pública*, 4ta. ed. (1966), Primera Parte, Teoría General; en *Public Administration and Policy*, ed. por Woll (1968), los Caps. 1 y 6; Shapiro, *The Supreme Court and Administrative Agencies* (1968); Landis, *The Administrative Process*, 7ma. ed. (1966), Caps. 2 y 3; White, *Introduction to the Study of Public Administration* (1946), un clásico en la materia; Herring, *Public Administration and the Public Interest* (1936), Caps. 1 y 23; y Haines and Dimock, editores, *Essays on the Law and Practice of Government Administration* (1935), págs. 3-43.

neamente que esas preocupaciones—las fundamentales—deben ser objeto de estudio y meditación por parte de los teóricos políticos y de los estudiosos del gobierno pero no por ellos. Han creído así, en gran medida, debido al influjo sobre ellos de la gran corriente conservadora en lo social y en lo económico del derecho común anglosajón. (²) Por eso es necesario, al trabajar con las decisiones judiciales de ese derecho, buscar y cuestionar su *ratio decidendi* y no meramente tomar sus fórmulas verbales. Hay que ir detrás de la decisión y del *dictum* para ver su pensamiento y su efecto real. (³) En otros derechos administrativos más maduros la situación es distinta. (⁴) Debemos aspirar a que nuestro derecho administrativo, y nuestro derecho en general, se desarrolle conforme a nuestro genio nacional y beneficiándose de las mejores corrientes del pensamiento jurídico. (⁵)

Dijimos antes que la jurisprudencia norteamericana está dividida sobre el asunto que nos ocupa. Cinco jurisdicciones estatales (Wis., Md., Ohio, Tenn. y R.I.) han opinado lo contrario de lo que nosotros aquí sostenemos, pero esas son jurisdicciones minoritarias. La mayoría de las jurisdicciones estatales está acorde con nuestro modo de ver la cuestión. Hemos

(²) Pound, *The Spirit of the Common Law* (1921) ; Pound, *The Formative Era of American Law* (1938) ; Griswold, *Law and Lawyers in the United States* (1965) ; Friedmann, *Law in a Changing Society* (1959), Caps. 2 y 11.

(³) Cardozo, *The Nature of the Judicial Process* (1939) ; Pound, "*The Theory of Judicial Decision*," 36 Harv. L. Rev. 641 (1923) ; Levi, *An Introduction to Legal Reasoning*, 10ma. ed. (1965) ; Hernández Gil, Antonio, *Metodología del Derecho*, Madrid (1945) ; Pound, *Law Finding Through Experience and Reason* (1960) ; *Smith* v. *Hodges*, 223 N.Y. 176, 184 (1918) (Cardozo).

(⁴) Schwartz, *French Administrative Law and the Common Law World* (1954) ; David, *French Law* (1972) ; Waline, *Droit Administratif*, 9na. ed. (1963) ; Trujillo, Quintana y Bolea, *Comentarios a la Ley de lo Contencioso Administrativo* (1965) ; Serra Rojas, *Derecho Administrativo* (1961).

(⁵) Véanse las palabras del jurista español Don Federico de Castro y Bravo citadas por nosotros en *Dalmau* v. *Hernández Saldaña*, 103 D.P.R. 487 (1975).

comprobado que trece de ellas (Cal., Conn., Del., Ky., Mass., Minn., Mo., N.M., N.Y., N.J., Pa., Okla. y Tejas) concurren con nosotros. Lo dicho se refiere a las jurisdicciones estatales. En cuanto a la federal, Davis encuentra que cada volumen de decisiones federales contiene casos en los cuales las agencias administrativas federales son parte y nadie ha cuestionado la corrección de esa práctica. 3 *Administrative Law Treatise* (1958), pág. 283.

Precisamente en el campo que nos ocupa—la zonificación y el urbanismo—se ha sostenido casi universalmente que las agencias administrativas representan de manera muy especial el interés general y que tienen capacidad jurídica para comparecer ante los tribunales a defender sus determinaciones. Probablemente el caso señero en esta materia es el de *Rommell* v. *Walsh*, 15 A.2d 6 (1940), pues el mismo aparece citado en casi todos los demás y en alguna que otra opinión se refieren a dicho caso como instructivo e iluminador. Véase por ejemplo, *Hashbrook* v. *Division of Tax Appeals*, 137 A.2d 585 (1958), cita precisa a la pág. 587. En dicho caso de *Rommell* el tribunal señaló que las agencias administrativas representan el interés público, el cual deben proteger, y especialmente las que tienen que ver con reglamentos de zonificación y urbanismo, y que por eso dichas agencias se diferencian de los tribunales tradicionales porque mientras ellas representan esos intereses los tribunales normalmente están concernidos con litigación privada. Cita precisa a la pág. 9.

Un caso muy parecido al de autos es el de *Zoning Board of Adjustment* v. *Dragon Run Terrace*, 216 A.2d 146 (1965). Allí un organismo, cuyos deberes son muy parecidos a nuestra Junta de Apelaciones sobre Construcciones, apeló de una decisión adversa del Tribunal Superior. La otra parte cuestionó su capacidad jurídica para recurrir en alzada. El tribunal sostuvo la capacidad de la Junta y añadió que aunque la misma no tenía existencia corporativa ni un interés personal o directo en el litigio, dicha Junta representaba el interés pú-

blico en materia de zonificación, que era un guardián del bien común y que definitivamente tenía capacidad jurídica para concurrir a los tribunales. Cita precisa a la pág. 148.

No deseamos hacer más larga esta opinión discutiendo otros casos muy parecidos y que prácticamente dicen lo mismo, pues el principio envuelto aunque fundamental es sencillo. Tal vez por ser fundamental es que es sencillo. Otros casos también de zonificación en que se sostuvo la capacidad jurídica de Juntas de Ajustes sobre esta materia son *Board of Adjustment* v. *Stovall*, 216 S.W.2d 171, 173 (1949); *Cunningham* v. *Leimkueller*, 276 S.W.2d 633 (1955).

Otros casos en los cuales se ha sostenido que diversas agencias administrativas, las cuales administran leyes de distintas materias, tienen capacidad jurídica para comparecer a los tribunales porque representan el interés público son los siguientes: *Moode* v. *Board of County Commissioners*, 45 N.W. 435 (1890); *Board of Commissioners* v. *Woodford Consolidated School Dist. No. 36*, 25 P.2d 1057 (1933); *Workmen's Compensation Board* v. *Abbott*, 278 S.W. 533 (1925); *Boyd & Usher Transport* v. *Southern Tank Lines, Inc.*, 320 S.W.2d 120 (1959). Hay otros pero no creemos necesario citarlos. El Profesor Louis Jaffe, una de las autoridades contemporáneas en los Estados Unidos en derecho administrativo, escribe que le sorprende que haya tribunales que hayan resuelto lo contrario. *Judicial Control of Administrative Action*, Abr. ed. (1965), pág. 537. El comentario más reciente de Davis también es afín a la posición que aquí tomamos. *Administrative Law Treatise*, 1970 Suplemento, pág. 702 y ss. Véase además nuestra discusión sobre capacidad jurídica en *Salas Soler* v. *Secretario de Agricultura*, 102 D.P.R. 716 (1974).

El Tribunal Supremo de los Estados Unidos también ha reconocido el derecho de las agencias administrativas federales a acudir a los tribunales en defensa de sus posiciones. *Federal Communication* v. *Broadcasting Co.*, 309 U.S. 134

(1940); *Labor Board* v. *Waterman,* 309 U.S. 206 (1940); *Chapman* v. *Federal Power Commission,* 345 U.S. 153 (1953).

Al final de la opinión mayoritaria se cita, en su apoyo, el caso de *United States* v. *Storer Broadcasting,* 351 U.S. 192 (1956). Pero es el caso que allí no se sostiene nada en conflicto con lo que aquí expresamos. Allí se trataba de un reglamento de la Federal Communications Commission y de su denegatoria a darle franquicias adicionales a Storer Broadcasting, porque esa firma ya tenía cinco estaciones en operación. Se sostuvo que el Tribunal de Apelaciones tenía jurisdicción para entender en el asunto; se revocó su decisión; y se devolvió el caso para que Storer ventilase sus objeciones al reglamento de la Comisión. En ningún momento se declaró que la Comisión no tenía capacidad jurídica para litigar. Por el contrario, el asunto no se planteó y el Tribunal asumió que la tenía.

La distinción que se hace en la opinión mayoritaria entre otras agencias y la Junta de Apelaciones sobre Construcciones no justifica, a mi juicio, el denegarle capacidad jurídica a esta última para comparecer a los tribunales. Como se sabe, prácticamente todas las Juntas, Comisiones y demás agencias administrativas tienen facultades cuasi legislativas, cuasi judiciales y cuasi ejecutivas. Su naturaleza es mixta y *sui generis.* Creo que es muy tarde en el desarrollo del derecho para tomar posiciones analíticas. (6)

Considerando este caso en los méritos estamos, mediante la primera parte de la opinión mayoritaria, con la cual concurro, resolviendo que la posición de la Junta de Apelaciones sobre Construcciones es la correcta. Dicha posición es la que protege el interés general y los intereses sociales para defender los cuales existen la Ley y la Junta de Planificación. De manera que este caso es un ejemplo concreto de lo que antes

---

(6) John Austin (*Province of Jurisprudence Determined,* 1832) y sus partidarios representan hoy una corriente minoritaria frente a Ihering, Ehrlich, Pound, Julius Stone (*The Province and Function of Law,* Harv. Univ. Press, 1961) y, naturalmente, los realistas norteamericanos.

hemos dicho en el sentido de que la Junta y los demás organismos administrativos representan el interés general, por cuya razón deben tener derecho a comparecer ante los tribunales.

Yo sostendría la capacidad jurídica de la Junta de Apelaciones sobre Construcciones y Lotificaciones para acudir a este Tribunal a defender el interés público.

—O—

Opinión concurrente del Juez Asociado Señor Martín en cuanto a la segunda parte de la opinión.

San Juan, Puerto Rico, a 18 de abril de 1975

Estoy conforme con la primera parte de la opinión que confirma la decisión de la Junta de Apelaciones sobre Construcciones y Lotificaciones. En cuanto a la segunda parte, o sea, la cuestión de la capacidad jurídica (*standing*) de la referida Junta de Apelaciones para comparecer ante nos a defender su decisión concurro con el resultado en el sentido de que no tiene tal capacidad, pero no estoy de acuerdo con todo el razonamiento utilizado en apoyo de tal resultado. Dada la conclusión a que llegó este Tribunal respecto a los méritos de la revisión que confirma la decisión de la Junta de Apelaciones creo innecesario la consideración de la cuestión de la capacidad jurídica (*standing*) de dicha Junta de Apelaciones.

Me reservo pues, hasta que surja el caso apropiado, la expresión de mi criterio para sostener que la Junta de Apelaciones no tiene capacidad jurídica para comparecer ante nos a defender sus decisiones.