Aponte Jiménez, Juez Ponente
TEXTO COMPLETO DE LA RESOLUCION
El recurrente, Joaquín Sánchez Ruiz, interesa la revocación de una resolución emitida por la Junta de Síndicos de la Administración del Sistema de Retiro de los Empleados del Gobierno y la Judicatura (en adelante “la Junta”), confirmando la determinación del Administrador de dicho sistema de retiro (en lo sucesivo “el Administrador de Retiro”) de “cesar” la pensión por incapacidad ocupacional que le fuera otorgada. A la luz de los fundamentos que a continuación esbozamos, acordamos denegar la expedición del auto de revisión solicitado.
Del expediente ante nuestra consideración surgen los siguientes hechos: El señor Sánchez era Trabajador III en el Departamento de Parques y Recreos. En el 1991, mientras desmantelaba un alumbrado en el curso de su empleo, sufrió una caída. Se reportó al Fondo del Seguro del Estado (F.S.E.). Los médicos que lo evaluaron le diagnosticaron “strain” crónico lumbar, fractura de la cadera derecha, “Fx. ” en ambas rodillas, contusión en la cabeza, “post-brain concussion”, vértigo y mareos. Todas estas condiciones relacionadas al accidente del trabajo que sufrió. Según la decisión del Administrador del F.S.E., el descrito cuadro clínico le produjo al señor Sánchez una incapacidad de cincuenta porciento (50%) en sus funciones fisiológicas generales.
*633 Considerando esa incapacidad, el Administrador de Retiro le otorgó en el 1994 una pensión por incapacidad ocupacional. En 1997, sin embargo, luego de revaluar el caso, el Administrador de Retiro determinó que el señor Sánchez había recuperado su capacidad productiva. Le informó, entonces, que su pensión por incapacidad ocupacional “[cjesará a los noventa (90) días de la notificación a su Agencia para que proceda con la reinstalación, o cuando sea reinstalado al servicio público, el término que sea menor. ”
En desacuerdo, el señor Sánchez solicitó reconsideración. Un oficial examinador designado por el Administrador, luego de celebrar una vista, presentó su informe y recomendación. Determinó que a éste se le realizaron dos evaluaciones médicas, una por el Dr. Pedro Berrios Ortiz el 11 de octubre de 1996 y la otra por el Dr. César Cintrón Valle, cirujano ortopeda, el 10 de enero de 1997. El doctor Berrios Ortiz diagnosticó “HNP L4/L5” con una “pobre” prognosis. Por el contrario, el doctor Cintrón Valle concluyó que la fractura del hueso púbico consolidó completamente con un residual de acortamiento de la pierna izquierda; la fractura del platillo tibial derecho consolidó completamente sin residual alguno; y la fractura del platillo tibial izquierdo consolidó completamente con deformidad en la “Valgus 10 g”. En la región cervical no halló espasmos musculares en la “columna LS”. Observó que el recurrente “no hace el más mínimo esfuerzo para flexionar la columna cuando se le pide que lo haga”. Consideró que estaba capacitado para realizar trabajo productivo. Indicó, además, que el Dr. Angel Viera Villanueva, consultor médico de la Oficina de Reconsideraciones, evaluó la evidencia médica que constaba en el expediente y encontró que el señor Sánchez “[ejstá capacitado para regresar a su empleo en labores livianas que no tenga que subir o trabajar en alturajs] no seguras. ”
Luego de considerar toda la evidencia, el oficial examinador recomendó al Administrador de Retiro que mantuviera su determinación de “cesar” la pensión ocupacional. Dicha recomendación fue adoptada, procediendo entonces a notificarle al señor Sánchez que reafirmaba su decisión original de “cesar” la pensión por incapacidad ocupacional y requerir su reinstalación en el empleo. Insatisfecho, el señor Sánchez acudió a la Junta. Entre otras cosas expresó que padece de “HNP L4/L5”. No menciona para nada el diagnóstico y prognosis del doctor Cintrón Valle ni la evaluación de la evidencia médica realizada por el doctor Viera. Argüyó que cumple con lo establecido en los Arts. 9 y 11 de la Ley Núm. 447 del 15 de mayo de 1951, según enmendada, 3 L.P.R.A. secs. 769 y 771, y con las Reglas 24 y 25 del Reglamento General para la Concesión de Pensiones, Beneficios y Derechos.
La Junta celebró vista. Posteriormente, emitió la resolución que nos ocupa. Determinó, en efecto, que el recurrente disfrutaba de los beneficios de una pensión por incapacidad ocupacional concedida, a raíz del accidente del trabajo de 1991. Asimismo, que al momento de la revaluación de la incapacidad realizada por el Administrador de Retiro, conforme a la evaluación médica del doctor Cintrón Valle antes descrita y su interpretación de las normas aplicables, estaba capacitado para regresar a su empleo en labores livianas. Confirmó la determinación del Administrador en cuanto a “cesar” la susodicha pensión por incapacidad.
Aún inconforme, el recurrente acude ante este Foro. Señala, en síntesis, que incidió la Junta al concluir que está capacitado para trabajar. Sostiene que las inconsistencias de las determinaciones de hechos unido á la evidencia contenida en el expediente y el dejar de considerar factores vocacionales amerita que revoquemos dicho dictamen.
No estamos de acuerdo. El Art. 9 de la Ley Núm. 447, supra, en parte, dispone lo siguiente:

“Todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional, siempre que: (a) según se dispone en la see. 771 de este título, se recibiere suficiente prueba en cuanto a la incapacidad mental o física del participante conforme los criterios normalmente 
*634
aceptados en el área de la compensación por incapacidad que mediante reglamento fije el Administrador; (b) el participante o el patrono, de acuerdo a los reglamentos de la Junta, notifique al Administrador con respecto a dicha incapacidad, y (c) la incapacidad fuere indemnizable de acuerdo con las disposiciones de las secs. 1 et seq. del Título 11. ”

De otra parte, el Art. 11 de la aludida ley, 3 L.P.R.A. sec. 771, entre otras cosas, establece que:

“Para los fines de una incapacidad ocupacional o no ocupacional, se considerará incapacitado a un participante cuando la incapacidad esté sustentada con suficiente prueba médica conforme a los criterios normalmente aceptados en el área de las compensaciones por incapacidad que mediante reglamento fije el Administrador y dicha prueba revele que el participante está total y permanentemente incapacitado e imposibilitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se lo hubiere asignado o para trabajar en cualquier empleo retribuido con retribución igual, al menos, a la que percibe. El Administrador, según lo crea conveniente y necesario, podrá requerir al participante que se someta a exámenes adicionales con médicos seleccionados por el Administrador.

El Administrador exigirá que todo pensionado que está disfrutando de una anualidad por incapacidad se someta periódicamente a un examen que practicarán uno o más médicos nombrados por el Administrador para determinar el estado de salud del participante y su grado de incapacidad. Si, como resultado de este examen, se encontrare que el pensionado se ha recobrado de su incapacidad lo suficiente para servir en cualquier empleo retribuido que le permita percibir una retribución por lo menos igual a la que percibía al tiempo de su retiro, el participante tendrá derecho a ser reinstalado en cualquier puesto en la agencia de la cual se separó por razón de incapacidad en el que se devengue una retribución igual a la que corresponda al puesto del cual se le separó al determinarse su incapacidad. Si dicho pensionado ocupase un puesto con una retribución menor a la que percibía al tiempo de su retiro, tendrá derecho a recibir por un año, a partir de la fecha en que sea reinstalado, una compensación igual a la diferencia entre el sueldo que disfrutaba a la fecha de su retiro y la retribución que perciba en el puesto actual, siempre que dicha diferencia no exceda el monto de la anualidad por incapacidad de que disfrutaba. ” (Enfasis suplido.)
La Regla 24.4 del Reglamento General para la Concesión de Pensiones, Beneficios y Derechos Núm. 4930, promulgado por el Administrador para implementar las antes transcritas disposiciones estatutarias, vigente desde el 25 de junio de 1993, provee como sigue:

“Si de la evidencia médica que consta en el expediente y conforme el listado de criterios médicos ( “Adult Listing”) establecidos para determinar incapacidad y del análisis e investigación que realicen los técnicos en determinación de incapacidad designados por el Administrador, no se pudiese determinar con certeza la incapacidad, se le podrá requerir al participante que se someta a aquellos exámenes médicos adicionales que se entiendan necesarios para adjudicar en sus méritos la petición de beneficios por incapacidad. Los exámenes médicos adicionales serán realizados por médicos seleccionados por el Administrador. Recibidos los resultados de dichos exámenes, el médico asesor hará la determinación final sobre incapacidad y someterá su recomendación al Administrador. Se considerará capacitado al participante, si no está total y permanentemente incapacitado e imposibilitado para cumplir los deberes de cualquier cargo que su patrono le hubiere asignado o para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo menos igual a la que está percibiendo. ”

De igual forma, la Regla 27 de dicho reglamento regula la reinstalación de pensionados por incapacidad. La misma, en parte, precisa que:

*635
“27.1- Cuando de las evaluaciones o exámenes médicos, que periódicamente ordene el Administrador para los pensionados por incapacidad, se determine que algún pensionado se ha recobrado de su incapacidad lo suficiente como para servir en cualquier otro empleo en el gobierno donde vaya a recibir una retribución por lo menos igual a la que percibía al tiempo de su retiro, el Administrador lo requerirá por escrito a la autoridad nominadora de la agencia donde el pensionado prestaba servicios al momento de acogerse a la anualidad por incapacidad, que proceda a la reinstalación conforme a la ley.

27.2- El Administrador notificará su determinación de cese de incapacidad al pensionado, por correo certificado y con acuse de recibo, dentro de los diez (10) días de haber tomado tal determinación. En dicha notificación, le orientará adecuadamente sobre su derecho a requerir reingreso al servicio gubernamental para que ejerza tal derecho y, asimismo, le notificará que transcurridos noventa (90) días desde la notificación, suspenderá los pagos de la pensión por incapacidad. Cuando el pensionado solicite reconsideración o radique apelación de dicha determinación de reinstalación por cese de incapacidad, la pensión no se suspenderá hasta transcurridos noventa (90) días desde que la decisión en reconsideración o en apelación, se convierta en final y firme por no haberse recurrido de la misma a la Junta de Síndicos o ante el Tribunal Superior, según sea el caso. ”

Como se ve, en primer lugar, la norma creada por el legislador y por el Administrador, bajo sus facultades de reglamentar las pensiones y beneficios a empleados gubernamentales, establece que para ser acreedor a una anualidad por incapacidad ocupacional, el empleado debe demostrar que está total y permanentemente incapacitado para realizar los deberes de su cargo o de cualquier otro asignado por su patrono, o para trabajar en cualquier otro empleo remunerado.
Asimismo, todo recipiente de tales beneficios tiene la obligación de someterse periódicamente a exámenes médicos a los fines de que el Administrador de Retiro evalúe si el pensionado recuperó la capacidad suficiente para trabajar en algún empleo con remuneración igual a la que percibía al momento que surgió la incapacidad. Si tales evaluaciones reflejan que el pensionado recuperó su capacidad productiva, se le requerirá al patrono que lo reinstale en el empleo y se le suspenderán los beneficios de la pensión. Con razón, el Tribunal Supremo interpretó que la incapacidad de un empleado para ser acreedor “a la anualidad que autoriza este artículo debe ser de tal naturaleza que le inhabilite para desempeñar las funciones de su empleo y de cualquier otro empleo remunerativo. ” Sánchez v. A.S.R.E.G.J., 116 D.P.R. 372, 376 (1985). 
En el presente caso, ese mismo fue el curso de acción que tomó el Administrador de Retiro, posteriormente confirmado por la Junta recurrida. El recurrente fue sometido a una evaluación médica por el doctor Cintrón Valle, galeno designado por el Administrador de Retiro. Ese médico, cirujano ortopeda, realizó una evaluación completa del pensionado. Examinó sus ojos, oídos, pulmones, corazón, abdomen, extremidades, la región cervical y la columna lumbo sacral. Se le practicó un estudio neurológico y le tomaron rayos-x. Su diagnóstico, como antes hemos reseñado, fue uno positivo. Indicó que todas las fracturas que sufrió el señor Sánchez se habían consolidado con las condiciones “residuales” de un acortamiento de la pierna derecha y una deformidad en el platillo tibial izquierdo. Concluyó que no estaba incapacitado para realizar trabajo productivo.
El recurrente intenta sustentar su incapacidad con el diagnóstico y prognosis del doctor Berrios Ortiz. Ante esa evaluación médica y la del doctor Cintrón Valle resulta evidente que tanto el Administrador como la Junta recurrida otorgaron mayor peso a la segunda. Esa, precisamente, fue también la recomendación del doctor Viera quien, como antes dicho, era en aquel momento el médico asesor de la Oficina de Reconsideraciones. Contrario a lo que propone el recurrente, no hemos detectado ninguna inconsistencia en las determinaciones de hechos de la Junta recurrida. La Junta, simplemente, expuso la evidencia médica que consideró para llegar a su determinación. Pero, como acabamos de ver, brindó un mayor peso al examen realizado por el doctor Cintrón Valle. En tal *636 sentido, no creemos que haya cometido error alguno.
No se nos escapa que las conclusiones e interpretaciones de las agencias administrativas, muchas de ellas en materia especializada, merecen gran consideración y respeto. Agosto Serrano v. F.S.E., 93 J.T.S. 37, a la pág. 10,510. Por ello, la revisión judicial de decisiones administrativas se limita a determinar si la agencia actuó arbitraria o ilegalmente, o en forma tan irrazonable que su actuación constituyó un abuso de discreción. Fuertes v. A.R.P.E., 93 J.T.S. 165, a la pág. 11385; Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699 (1975). Dicha norma de deferencia judicial se funda en la experiencia y conocimiento especializado de las agencias sobre los asuntos dentro del ámbito de sus facultades y responsabilidades. Facultad de Ciencias Sociales v. C.E.S., 93 J.T.S. 88, a la pág. 10,783; Asoc. de Doctores v. Morales, 93 J.T.S. 12, a la pág. 10,349.
Siendo esto así, debemos ser cautelosos al intervenir con las actuaciones administrativas. Metropolitana S.E. v. A.R.P.E., supra; Fuertes v. A.R.P.E., supra; Viajes Gallardo v. Clavell, 92 J.T.S. 90, a la pág. 9,685. No podemos sustituir el criterio de la agencia administrativa por el nuestro. Facultad de Ciencias Sociales v. C.E.S., supra. Por todo lo cual, no estamos en condiciones de interferir con el juicio que de la prueba médica hiciera la Junta.
Para concluir, ni la ley ni el reglamento sobre pensiones por incapacidad ocupacional disponen sobre qué factores vocacionales habrán de considerarse para determinar si un empleado público es acreedor a ese derecho. Tanto la ley como el reglamento lo que establecen es que existirá tal derecho cuando el empleado presente suficiente prueba médica de su incapacidad física o mental. Más aún, esa incapacidad tiene que .ser total y permanente. Tampoco se requiere tal análisis de elementos vocacionales al revaluar si un pensionado ha recuperado su capacidad productiva. No hemos encontrado ninguna base en la ley o el reglamento para lo propuesto por el recurrente.
Con estos antecedentes, por entender que la resolución recurrida es esencialmente correcta, denegamos expedir el auto de revisión solicitado por el recurrente.
Lo acuerda el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2000 DTA 12
1. Este beneficio se hizo retroactivo a mayo de 1992.
2. Somos conscientes de que los estatutos con propósitos remediales deben interpretarse liberalmente a favor del grupo de personas que pretende proteger. Sin embargo, en el ánimo de formular una interpretación liberal, no podemos menospreciar el claro texto de la ley. Véase, Rodríguez Díaz v. P.R.T.C., 98 J.T.S. 64, a la pág. 975.