Brau Ramírez, Juez Ponente
*943 TEXTO COMPLETO DE LA RESOLUCION
I
La parte recurrente, la Asociación de Detallistas de Gasolina de P.R. y los señores Manuel Santos Colón, Gilfredo Hernández, Héctor E. Colón y William López Albino, solicita la revisión de una resolución emitida el 11 de junio de 1998 por la Junta de Apelaciones sobre Construcciones y Lotificaciones, confirmando una resolución anterior emitida el 5 de agosto de 1996 por la Administración de Reglamentos y Permisos ("A.R.P.E.").
Mediante el dictamen en cuestión, A.R.P.E. autorizó un anteproyecto, presentado por el recurrido Sergio Medina, para el establecimiento y construcción de una estación de servicio de gasolina en un predio localizado en la Carretera Núm. 111, en el municipio de Moca.
Mediante resolución emitida el 11 de septiembre de 1998, concedimos término a la parte recurrida para que expresara su posición. La parte recurrida ha comparecido por escrito, expresando sus argumentos en contra del recurso.
Procedemos a resolver.
H
Según se expone en el recurso, en o cerca de 1994, el recurrente, actuando por conducto del Ing. Roberto García Vádiz, sometió para la aprobación de A.R.P.E. el anteproyecto núm. 94-27-E-185-DPA para la construcción y operación de una estación de servicio de gasolina que funcionara las veinticuatro horas al día, en un distrito de zonificación comercial (C-l) ubicado en la Carretera Estatal Núm. 111, kilómetro 3.9, en el municipio de Moca.
El anteproyecto proponía el establecimiento de una gasolinera en un solar de 1,211.739 metros cuadrados; comprendía la construcción de una marquesina en hormigón armado, bloques y acero estructural de 7.0 metros x 9.2 metros, dos isletas, dos bombas dobles y dos tanques de 10,000 galones cada uno.
El predio colindaba en su patio delantero con una calle marginal que une a la Carretera Núm. 111, al posterior, con un edificio dedicado a la venta de piezas de automóviles; en el lateral izquierdo, visto de frente a la vía, con un distrito R-3 donde ubica un Supermercado Mr. Special; en su lateral derecho, con un distrito C-l y terrenos del concesionario.
Toda vez que el proyecto colindaba con un distrito zonificado R-3, se solicitó una variación con respecto a la separación de los tanques del edificio principal y las colindancias del predio.
El proyecto estaba respaldado por un estudio de viabilidad confeccionado por el Ing. Héctor Morales Vargas.
En el lugar propuesto para la gasolinera, existen seis estaciones de gasolina, ubicadas dentro de un radio de 1,600 metros de la estación propuesta por el recurrido. Dos de dichas estaciones quedan dentro de los 800 metros lineales y 400 metros radiales de la estación propuesta, contrario a la Sección 85.05 del Reglamento de Zonificación (Reglamento de Planificación Núm. 4 de la Junta de Planificación del 16 de septiembre de 1992), por lo que el recurrido también solicitó una variación en tomo a dicho requisito.
Cuatro de los dueños de las estaciones de gasolina existentes, los recurrentes Manuel Santos, Gilfredo Hernández, Héctor Colón y William López, comparecieron ante A.R.P.E. en oposición a la *944 propuesta del recurrido. También compareció en oposición la Asociación de Detallistas de Gasolina, en virtud de lo establecido en el Art. 4(h) de la Ley Núm. 73 de 23 de junio de 1978, 23 L.P.R.A. see. 1134(h). Los recurrentes alegaron que la propuesta no cumplía con los requisitos reglamentarios y se opusieron a las variaciones solicitadas.
Luego de otros trámites, el 5 de agosto de 1996, A.R.P.E. aprobó el anteproyecto. A.R.P.E. detérminó que aunque la propuesta del recurrido no cumplía con los criterios de separación mínima establecidos por la Sección 85.05 del Reglamento de Zonificiación, la Sección 86.05(1) del referido Reglamento le confería discreción para modificar dichos requisitos cuando se establecía, mediante un estudio de viabilidad, la existencia de un incremento en la densidad poblacional y en el tránsito vehicular en el sector, lo que, ajuicio de la agencia, el recurrido había conseguido establecer.
Los recurrentes apelaron ante la Junta de Apelaciones sobre Construcciones y Lotificaciones, alegando que la propuesta incumplía la reglamentación pertinente. La Junta procedió a celebrar una vista en tomo a la solicitud.
Durante la vista testificó como perito de los recurrentes el Ing. Camilo Almeyda. El Ing. Almeyda declaró que había participado en la preparación de cincuenta y ocho (58) estudios de viabilidad, por lo que conocía las normas reglamentarias. Fue director del Area de Planificación Integral del Departamento de Transportación y Obras Públicas y Consultor del grupo francés del tren urbano.
El ingeniero Almeyda testificó que el dato principal en un estudio de viabilidad es el tránsito. Expresó que consideraba que para este tipo de casos no se requiere ser economista. El ingeniero Almeyda expresó que a lo largo de su experiencia había desarrollado una fórmula de penetración, comparando el movimiento vehicular con una cifra base de 1.672% que era la penetración. Indicó que su método había sido utilizado por otras personas, incluyendo el Departamento de Comercio. El estudio fue realizado en el Area Metropolitana en sectores de gran densidad poblacional, sectores residenciales, turísticos y vías arteriales de Guaynabo, Carolina, Isla Verde y Río Piedras, entre otras.
Para el presente caso examinó la resolución apelada, el estudio de viabilidad, el análisis del Departamento de Comercio y visitó el lugar en Moca. El Ing. Almeyda admitió que dos (2) de las gasolineras no observaban las distancias requeridas, por lo que resultaba necesario anticipar el impacto de la estación propuesta sobre las estaciones existentes.
El Ing. Almeyda señaló que el estudio de viabilidad sometido por la parte recurrida se limitaba a concluir que no existía impacto negativo. No obstante, opinó que no existía un aumento poblacional o en el tránsito vehicular que justificara la modificación de los requisitos reglamentarios.
El Ing. Almeyda reconoció que no se había autorizado una nueva gasolinera en Moca desde 1984. Declaró, sin embargo, que al analizar los datos sobre población y tránsito que aparecían en el informe de viabilidad y compararlos con los aumentos de población y de movimiento vehicular del resto de la isla para el mismo período, surgía que el aumento era normal... El perito concluyó que "la Agencia Apelada al ejercer su discreción bajo la Sección 86.05(1) del Reglamento de Zonijicación, no lo hizo en un caso particularmente extraordinario como intima debe ser."
El perito señaló que el estudio de viabilidad sometido descansaba sobre un promedio de dos viajes diarios, lo que, según su opinión tendía a maximizar erróneamente el movimiento de los no residentes frente a los residentes del sector. El Ing. Almeyda expresó que esto no era así en ninguna parte del mundo.
El Ing. Almeyda opinó que la demanda de gasolina era menor que la indicada en el estudio de viabilidad.
A preguntas de la parte recurrida, el Ing. Almeyda admitió que no había realizado conteo ni mensura del predio ni determinó la demanda total de gasolina en el área.
El recurrente Manuel Santos Colón declaró que era comerciante y residente de Moca. Indicó que tenía dos estaciones de gasolina en el área de mercado afectada por la propuesta. Expresó que, de *945 aprobarse la propuesta, ocurriría una reducción en las ventas de sus estaciones, las que no resultarían rentables. Señaló que al aprobarse la Estación Esso del Sr. Wilfredo Hernández las ventas de su estación se redujeron de 80,000 galones a un promedio de 57,000 galones. El testigo indicó que una venta de menos de 40,000 galones hacía que su gasolinera no fuera rentable.
A preguntas del representante legal del recurrido, admitió que el recurrido operaba una estación en la Calle Barbosa del Municipio y que el recurrente lo desahució. El testigo declaró que su estación del pueblo vendía alrededor de 57,000 galones y la del Barrio Voladora unos 40,000 galones. Insistió en que cualquier estación en la Carretera 111 afectaría sus ventas.
Por la parte recurrida, declaró el Ing. Roberto García, proyectista, quien testificó sobre una enmienda en el plano del solar objeto del desarrollo.
El recurrido Sergio Medina declaró que llevaba más de veinte (20) años vendiendo gasolina y ofreciendo servicios para automóviles. El recurrido declaró que era propietario del "auto parts", que quedaba en la parte posterior de la estación y de predios aledaños; Operó la estación propiedad del opositor Manuel Santos por alrededor de 20 a 22 años.
El recurrido declaró que consideraba que el área necesitaba un mejor servicio, lo que le había sido comunicado por muchos, por lo que estaba proponiendo una estación de servicio las 24 horas. Expresó que estimaba que el pueblo de Moca había tenido un crecimiento que se advertía en las nuevas facilidades, construidas y propuestas, como lo eran: un centro comercial, un tribunal, el Hospital San Carlos, Parque Pasivo "La Moca", banco, locales de "fast food" (Me Donald, Burger King) edificio de correos y la Escuela Superior.
El Ing. Héctor Morales Vargas declaró que él había preparado el estudio de viabilidad. Dicho perito declaró que había realizado estudios de viabilidad internos cuando era empleado de la Caribbean Petroleum Gulf y cuatro (4) por cuenta propia.
Para el informe del caso de autos, utilizó informes del censo, de la Autoridad de Carreteras, del Departamento de Transportación y Obras Públicas, los expedientes de A.R.P.E. en los casos de las gasolineras Texaco y Esso y sus respectivos estudios de viabilidad. Realizó un conteo de vehículos frente a la propiedad. Conoce el sector por ser natural de Moca.
La metodología utilizada fue el factor captación, no la demanda total de gasolina. No utilizó la metodología de penetración o consumo promedio anual. Utilizó el Mapa de Afluencias y un estudio o conteo realizado por la Autoridad de Carreteras al kilómetro 3.6. Las cifras de este estudio reflejan un crecimiento en el flujo vehicular de 14,081 vehículos en 1984 a 30,741 en 1997. El crecimiento poblacional de Moca de 1980 a 1990 fue de 12.8%, lo que resulta mayor que el crecimiento para Puerto Rico durante este mismo período, que fue de 10.2% y que el registrado para Aguadilla y San Sebastián, que fue de 8.7%.
La oferta de gasolina en esa área es de 3,120,000 galones anuales, mientras que la demanda es de 7,978,000 galones anuales, por lo que, según el perito, existen unos 4 millones de galones para el crecimiento de las estaciones existentes y satisfacer otras gasolineras.
El testigo explicó que a solicitud de Fomento Comercial se realizó otro estudio complementario por la Sra. Elba Sobrino que refejaba el impacto de la gásolinera propuesta sobre las seis (6) gasolineras existentes. Utilizó una metodología distinta a la suya.
La Sra. Sobrino declaró sobre su informe. Dicha testigo indicó que tenía una maestría en economía. En respuesta a los requisitos del Departamento de Comercio preparó un compendio para establecer el impacto de la nueva estación sobre las seis (6) estaciones existentes. De su estudio, se desprende que, a base del promedio de ventas en el área de mercado, el porciento de captación es de un 10% en 1995 y 10% en 1998, quedando libre un 90% de la demanda para otras gasolineras.
Al preguntársele sobre el criterio de dos (2) viajes adoptado en su informe, declaró que esto era un promedio y que había utilizado una fórmula conservadora donde el tránsito aumentaba en la misma *946 proporción en que aumentaban los viajes.
A base de la prueba desfilada, el 11 de junio de 1998, la Junta emitió la resolución recurrida, confirmando la determinación de A.R.P.E. de aprobar el anteproyecto.
En su resolución, la Junta concluyó que "[1 ]a gasolinera propuesta incumple con la Sub-sección 85.05 del Reglamento por existir una gasolinera dentro de los 800 metros de separación lineal en el mismo margen de vía (Esso) y otra gasolinera dentro de los 400 metros radiales en otra vía (Gulf)."
No obstante, estimó que A.R.P.E. había actuado dentro de las prerrogativas que le confería la Sub-sección 85.16 de modificar los requisitos del Reglamento. Expresó:

"La prueba obrante en autos demuestra un aumento en el tránsito vehicular del sector y un incremento en facilidades institucionales, comerciales y de servicios desarrollados o desarrollándose en áreas próximas del Municipio de Moca."

De otro lado la prueba presentada por la parte apelante se limitó a la crítica de la metodología utilizada sin presentar datos fehacientes que contradigan los presentados por los proponentes y las agencias admitiendo existen varias metodologías de análisis. Añade únicamente el testimonio de un dueño de gasolinera que alega una posible reducción de sus ventas.
No se ha demostrado, por lo tanto, que la Agencia Apelada abusó en su discreción y que la decisión autorizando es una arbitraria y/o caprichosa, por lo que la determinación tomada en instancia se presume correcta y válida...
Insatisfechos con esta decisión, los recurrentes acudieron ante este Tribunal.
m
En su recurso, la parte recurrente plantea que la Junta fue arbitraria en la apreciación de la prueba sometida por las partes, lo que lo llevó a eximir a la estación de gasolina propuesta en el caso de epígrafe de las disposiciones reglamentarias sobre distancias lineales y radiales que tienen que existir entre estaciones de gasolina y que son de estricto cumplimiento, a pesar de que no se presentó prueba que justificara la modificación de dicha reglamentación.
La política pública en nuestra jurisdicción, mediante la Ley Núm. 73 del 23 de junio de 1978, 23 L.P.R.A. secs. 1131 y ss., es la de considerar la industria de la gasolina como una revestida de interés público. 23 L.P.R.A. sec. 1131.
Mediante la referida Ley, se adoptó un esquema de reglamentación comprensiva de dicha industria por diversas agencias. En particular, se encomendó a la Junta de Planificación establecer y proveer "para el control del desarrollo y uso de terrenos a destinarse a la construcción de estaciones de servicio de venta al detal de gasolina y/o combustibles especiales, con el propósito de evitar la proliferación irrazonable de las mismas dentro de un mercado geográfico." 23 L.P.R.A. sec. 1133(g).
La Ley también dispuso:

"La Junta de Planificación y/o la Administración de Reglamentos y Permisos requerirán que toda consulta de ubicación o solicitud de permiso de construcción o de uso para el establecimiento de una estación de servicio de venta al detal de gasolina, venga acompañada de un estudio de viabilidad que demuestre la necesidad y conveniencia del establecimiento de la misma, independientemente de que esté envuelta un área tonificada o no tonificada o de la clasificación que le pueda corresponder.

Dicho estudio de viabilidad incluirá entre otros aspectos la concentración poblacional y de tránsito vehicular del área, los negocios similares que puedan existir dentro de un perímetro de mil seiscientos (1,600) metros radiales, el impacto anticipado del nuevo establecimiento sobre aquellos de naturaleza similar comprendidos dentro de dicho perímetro, y cualesquiera otros aspectos que por reglamento se requieran.

*947
En todos estos casos, sólo podrá concederse la ubicación consultada o el permiso solicitado, previa celebración de vistas publicas de conformidad con las disposiciones aplicables de ley o reglamento y notificación previa a la Oficina de Energía, al Departamento de Comercio, al Departamento de Asuntos del Consumidor, al Departamento de Justicia, a los distribuidores mayoristas dueños o arrendatarios de las estaciones de servicio comprendidas dentro del período anteriormente establecido a propósito del estudio de viabilidad, a los detallistas que operan dichas estaciones de servicio, a las asociaciones existentes de detallistas de gasolina, y a cualquier otra parte afectada o interesada según se disponga por reglamento o surja de los expedientes correspondientes.

La concesión de ubicación de permisos se hará en consulta con y previa recomendación del Departamento de Comercio". 23 L.P.R.A. sec. 1134(h).
Siguiendo el mandato del estatuto, la Junta de Planificación incorporó, dentro de su Reglamento de Zonificación, el Tópico 10 sobre Estaciones de Gasolina, Secciones 85.00 a 88.11.
La Sección 85 del citado Reglamento establece los requisitos generales para el establecimiento de estaciones de gasolina, incorporando, entre otros, el requisito de un estudio de viabilidad donde se considere la concentración poblacional y de tránsito vehicular, la intensidad de usos comerciales, industriales e institucionales, los negocios similares al propuesto y el impacto de este último sobre los primeros, la forma de operación de la estación y cualquiera otros factores relevantes.
La sección 85.05 establece, en lo pertinente:

"Separación Entre Estaciones de Gasolina - La separación mínima a requerirse entre una nueva estación de gasolina y otra existente o previamente autorizada se determinará de acuerdo con lo que se establece más adelante:

1. En casos de distritos comerciales e industriales, que no linden por ninguno de sus lados con terrenos clasificados en un Distrito R-0 o RT-0 para la protección de una vía arterial, la separación mínima entre estaciones de gasolina será de ochocientos (800) metros lineales cuando dichas estaciones estén localizadas en cualquier margen de una misma vía y de cuatrocientos (400) metros radiales cuando éstas estén localizadas en vías diferentes.

A los efectos de aplicación de la anterior disposición se entenderá por vía arterial cualquier vía a la que se le haya asignado un número de ruta por el Departamento de Transportación y Obras Públicas y aquellas así designadas por la Junta mediante resolución."
Por su parte, la Sección 85.16 del Reglamento establece, en lo pertinente:

"Prerrogativas de la Administración de Reglamentos y Permisos - La Administración de Reglamentos y Permisos podrá modificar las disposiciones establecidas en este Reglamento sobre estaciones de gasolina cuando ocurra cualquiera de las siguientes condiciones:

1. Cuando un estudio de viabilidad refleje un incremento en la densidad poblacional y en el tránsito vehicular en determinado sector y justifique la ubicación de una estación de gasolina, para servir dicho sector, a una distancia de otras estaciones de gasolina menor que las distancias radiales y lineales que el caso requeriría para cumplir con lo establecido en la subseccijón ] 85.05 ...de este Reglamento. En estos casos el estudio que se realice deberá tomar en consideración el efecto que ésta pueda causar sobre otras estaciones de gasolina existentes o previamente autorizadas o sometidas a la consideración de la A.R.P.E."
En la situación de autos, no existe controversia en tomo a que la propuesta del recurrido no cumplía con los criterios de separación establecidos por la Sección 85.05 del Reglamento de Zonifiqación. La Junta entendió, sin embargo, que A.R.P.E. gozaba de facultad para modificar dichos requisitos, bajo la Sub-sección 85.16 del Reglamento, toda vez que el estudio de viabilidad sometido reflejaba un aumento en densidad poblacional y en tránsito vehicular.
La parte recurrente impugna dicha determinación. Señala que el incremento poblacional y de tránsito *948 vehicular registrado en el caso de autos fue uno normal, que no justificaba eximir al recurrido de la Sección 85.05. Los recurrentes plantean que, en sana hermenéutica, la facultad concedida a A.R.P.E. por la Sección 85.16, de modificar los requisitos de distancias lineales y radiales establecidos en la Sección 85.05, debe entenderse reservada solamente para casos extraordinarios. De otro modo, sugieren los recurrentes, la excepción se tragaría la norma, quedando al libre arbitrio y discreción de la agencia el aplicar o no los requisitos en cuestión.
El argumento de los recurrentes no es insubstancial. La norma de hermenéutica es que la correcta interpretación de una ley, reglamento o contrato requiere una consideración integrada y armoniosa de cada uno de sus preceptos y/o cláusulas, de modo que se brinde efectividad a cada uno de los términos empleados. Véase, González Pérez v. Estado Libre Asociado de P.R., _ D.P.R. _ (1995), 95 J.T.S. 52, a la pág. 842; Ojeda Ojeda v. El Vocero, Inc., _ D.P.R. _ (1994), 94 J.T.S. 131, a la pág. 334; Pueblo en Interés del Menor L.R.R., 125 D.P.R. 78, 87 (1989); R. Elfren Bemier y José Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da edición, Publicaciones JTS, Inc., 1987, a la pág. 315.
Coincidimos con la parte recurrente de que la interpretación ampulosa y liberal de la Sección 85.16 del Reglamento de Zonificación tomaría inoperante los requisitos establecidos por la Sección 85.05 de dicho cuerpo normativo.
Ahora bien, el principio en nuestra jurisdicción es que las interpretaciones de los organismos administrativos especializados de sus propios reglamentos y/o de los estatutos que persiguen implementar merecen gran deferencia por los tribunales. La revisión judicial en estos casos se limita a determinar si la agencia actuó arbitraria o ilegalmente o en forma tan irrazonable que su actuación constituyó un abuso de su discreción. Fuertes v. Administración de Reglamentos y Permisos, _ D.P.R. _ (1993), 93 J.T.S. 165, a la pág. 11,385; Del Rey v. J.A.C.L., 107 D.P.R. 348, 355 (1978); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699 (1975).
El Tribunal Supremo de Puerto Rico ha advertido que si la interpretación adoptada por una agencia especializada es razonable y consistente con el propósito legislativo que inspira el estatuto directivo, el tribunal debe abstenerse de intervenir con la misma. Comisionado de Seguros de P.R. v. General Accident Insurance Co., _ D.P.R. _ (1993), 93 J.T.S. 10, a la pág. 10,334; Colón Ventura v. Méndez, _ D.P.R. _ (1992), 92 J.T.S. 51, a la pág. 9,454; Vázquez v. A.R.P.E., _ D.P.R. _ (1991), 91 J.T.S. 53, a la pág. 8,657.
En el presente caso, el texto de la Sección 85.16 autorizaba expresamente a A.R.P.E. a modificar los requisitos de la Sección 85.05 en casos de un incremento poblacional y de tránsito vehicular. El récord refleja, en este sentido, que la población en Moca sufrió un incremento de 12.8% en el período entre 1980 a 1990, lo que significaba un aumento mayor que el promedio para el resto de la Isla, que fue de 10.2%. También surge del récord que el tránsito vehicular para el área aumentó de 14,081 vehículos en 1984 a 30,741 vehículos en 1997.
La Sección 85.16 también requiere que se preste consideración al efecto que la nueva gasolinera pueda tener sobre los otros negocios existentes. La contención de la parte recurrente, en este particular, es que la gasolinera propuesta por el recurrido, habrá de tener un impacto adverso sobre las otras estaciones operando en el pueblo. Los recurrentes insisten en que el testimonio de su perito levantó serias interrogantes sobre la metodología utilizada por los peritos de la parte recurrida.
Lo cierto es, sin embargo, que la determinación de la Junta de que la nueva gasolinera no afectará adversamente a las estaciones existentes está suficientemente apoyada por los testimonios de los peritos presentados por el recurrido ante la agencia, quienes declararon que la demanda existente es suficiente para suplir a las estaciones actuales además de a la nueva estación.
Según se conoce, la norma en el Derecho Administrativo es que las determinaciones de hechos formuladas por las agencias serán sostenidas por el tribunal, si las mismas están basadas en evidencia sustancial que obra en el expediente administrativo. 3 L.P.R.A. sec. 2175. Rivera Rentas v. A & C Development Corp., _ D.P.R. _ (1997), 97 J.T.S. 143, a la pág. 344; Associated Insurance Agencies, Inc. v. Comisionados de Seguros de P.R., _ D.P.R. _ (1997), 97 J.T.S. 142, a la pág. *949 332; Asociación de Doctores en Medicina al Cuidado de la Salud Visual v. Colegio de Optómetras de Puerto Rico, _ D.P.R. _ (1993), 93 J.T.S. 12, a la pág. 10,349; Puerto Rico Telephone Company v. Unión Independiente de Empleados Telefónicos, _ D.P.R. _ (1992), 92 J.T.S. 93, a la pág. 9,710; Henríquez v. Consejo de Educación Superior, 120 D.P.R. 194, 210 (1987).
"Evidencia sustancial" para sostener la actuación administrativa es aquella que una mente razonable puede aceptar como adecuada para sostener una conclusión. La intervención del Tribunal en estos casos, por lo tanto, está limitada a evaluar si la decisión de la agencia es razonable y no a formular un juicio independiente en tomo a los hechos. En particular, si existe más de una interpretación razonable de los hechos, los tribunales vienen obligados a sostener la decisión de la agencia. Associated Insurance Agencies, Inc. v. Comisionados de Seguros de P.R., 97 J.T.S. 142, a las págs. 332-333; Hilton Hotels International v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953).
En el presente caso, carecemos de elementos de juicio para sustituir el criterio de la Junta. Observamos que, según el récord, en el municipio de Moca no se han aprobado nuevas gasolineras desde 1984, a pesar del aumento poblacional experimentado. También que el recurrido Operó una gasolinera por muchos años en un local propiedad de uno de los recurrentes, hasta que fue desahuciado. En estas circunstancias, no podemos concluir que la determinación de la agencia hubiera sido irrazonable.
Por los fundamentos expresados, se deniega el auto solicitado.
Lo pronunció el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General