# 2008 DTA 89

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL II**

REINALDO TOLLENS RAMOS
Recurrente

v.

JUNTA DE SINDICOS DE LA ADMINISTRACION DE SISTEMAS DE RETIRO DE LOS
EMPLEADOS DE GOBIERNO Y LA JUDICATURA DEL ESTADO LIBRE ASOCIADO
Recurrida

Núm. KLRA-2007-00947

San Juan, Puerto Rico, a 30 de junio de 2008

Panel integrado por su Presidenta, la Juez García García, la Juez Varona Méndez y el Juez Cabán García

Cabán García, Juez Ponente

### TEXTO COMPLETO DE LA SENTENCIA

El Sr. Reinaldo Tollens Ramos (Recurrente) solicita la revisión judicial de una decisión en apelación de la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (Junta) que confirmó una decisión del Administrador denegando los beneficios de una pensión por incapacidad ocupacional o no ocupacional.

### I

El Recurrente nació el 3 de enero de 1959. Luego de graduarse de escuela superior, estudió un grado asociado en computadoras. Trabajó para la Administración de Servicios Agrícolas, ocupando un puesto de Operador de Computadoras. Ingresó al Sistema de Retiro el 1 de agosto de 1988, cotizando 12.75 años. El Recurrente tuvo dos accidentes a consecuencia o en su trabajo, en los cuales se reportó al Fondo del Seguro del Estado (FSE).

El primer accidente ocurrió el 23 de septiembre de 1999, donde el Recurrente alegó que *"al preparar unos documentos escritos para el oficial sentí adormecimiento en la mano derecha y luego en la izquierda que le ocasionaron que el dolor se corriera hasta los hombros, brazo izquierdo y cuello."* [1] El FSE en su caso 00-64-01753-0 le diagnosticó y relacionó una condición de Esguince Cervical, Esguince Ambos Hombros, S/P Artroscopia Hombro Izquierdo, compensado con un 5% funciones fisiológicas generales, Condición Cervical por Dolor Residual y un 40% funciones fisiológicas, pérdida del brazo izquierdo en o más arriba del codo.

El segundo accidente ocurrió el 4 de enero de 2001, donde el Recurrente alegó que *"iba saliendo de la oficina y se le trabó el pie con una de las cajas y cayó de rodilla, lastimándose la espalda baja, rodilla derecha y rodilla izquierda."* [2] El FSE en su caso 01-64-03482-6 le diagnosticó y relacionó un *"Sprain Lumbosacral, Trauma Ambas Rodillas, HNP L5-S1, S/P Artroscopia Izquierda "Tear of Lateral Meniscos Left Knee, CTS bilateral, Neuritis Secundaria a bloqueo y anestesia del nervio mediano"*, compensado con una incapacidad de un 10% funciones fisiológicas general por condición orgánica lumbosacral y HNP L5-S1, con un 10% de incapacidad de sus funciones fisiológicas generales a interpretarse como Rodilla Izquierda Anquilosada en buena posición y un 5% de sus funciones fisiológicas generales a interpretarse como Rodilla Derecha Anquilosada en buena posición.

Además de las condiciones médicas relacionas por el FSE, el Recurrente padece de otras condiciones no relacionadas: disco disecado L4-L5, diabetes miellitus I (dependiente de insulina), osteoartritis, abrasión condroplastía derecha, obesidad mórbida, hipertensión y condición emocional diagnosticada como desorden depresivo mayor severo con rasgos sicóticos.

Apoyado en las condiciones médicas relacionadas por el FSE y las condiciones no relacionadas, el Recurrente solicitó el beneficio de una pensión por incapacidad ocupacional y no ocupacional ante la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura (Administración) el 21 de junio de 2001.

La Administración, luego de evaluar la evidencia médica, denegó la solicitud de pensión por entender que: *"de los informes médicos que constan en nuestro poder relativos a su condición, se ha determinado que no está total y permanentemente incapacitado para cumplir los deberes del puesto que en el servicio del patrono se le hubiere asignado. Otras razones: las condiciones no relacionadas por la Corporación del Fondo del Seguro del Estado, también fueron evaluadas. No obstante, médicamente se determinó que las mismas no son*

*incapacitantes conforme a las disposiciones de la Ley 447 según enmendada."*

Inconforme con la decisión administrativa, el Recurrente apeló ante la Junta en junio de 2002. Debido a que el día de la vista, 10 de junio de 2004, el Recurrente presentó nueva evidencia médica, se devolvió el caso a la Administración. El 18 de agosto de 2005, la Administración se reafirmó en su decisión de no concederle al Recurrente los beneficios de pensión solicitados. El 8 de septiembre de 2005, el Recurrente presentó una segunda apelación ante la Junta.

Mediante resolución del 23 de mayo de 2007, notificada el 20 de julio de 2007, la Junta confirmó la decisión del Administrador y en consecuencia denegó la pensión por incapacidad bajo las disposiciones de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada. El 9 de agosto de 2007, el Recurrente presentó moción de reconsideración la que no fue considerada dentro del término dispuesto por ley.

Informe con la decisión administrativa, el Recurrente acude ante este Foro señalando los siguientes errores:

*"(A) Erró la Junta de Síndicos de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura al confirmar la decisión de la Administración de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura al denegar al Recurrente los beneficios de una incapacidad ocupacional y no ocupacional.*

*(B) Erró la Junta de Síndicos al emitir determinaciones de hechos y de derecho no fundamentadas en la evidencia recibida, ni en la totalidad del expediente y de manera simplista, genérica y pro forma.*

*(C) Erró la Junta de Síndicos y la Administración de Retiro al no evaluar en conjunto las condiciones médicas presentadas por el recurrente de manera que la determinación se ajustara a la realidad de la salud física y emocional del Recurrente de acuerdo a la totalidad de la prueba presentada.*

*(D) Abusó su discreción la Junta de Síndicos y la Administración de Retiro al denegar arbitrariamente la pensión ocupacional al Recurrente."*

## II

Durante la vista celebrada en este caso, el único testigo que declaró bajo juramento fue el Recurrente. Su testimonio fue resumido por la Junta de la siguiente forma:

*"El apelante dijo su fecha de nacimiento (3 de enero de 1959), su edad (57) y sus estudios (Grado Asociado en Computadora). Vive con su mamá, su abuela quien tiene 100 años y una hermana con problemas renales. Tiene licencia de conducir, pero no guía. Su hermana o sobrina lo llevan a los médicos. Su último trabajo fue como Operador de Computadoras en la Administración de Servicio de Desarrollo Agropecuario, Integrante del Centro de Cómputos. Su labor era dar apoyo técnico a 56 tiendas que vendían materiales y maquinarias agrícolas. Los apoyaba a través del teléfono, si no se podía arreglar, se enviaba a buscar la máquina a ver si se podía arreglar personalmente y si no se enviaba a una compañía contratada. En algunos casos visitaba las tiendas, cuando la persona en el centro no sabía mucho por su poca escolaridad. Su trabajo lo realizaba parado, sentado y arrodillado, cuando tenía que cambiar o poner las cajas de papel al printer. Hacía fuerzas pues cargaba las máquinas al cambiarlas de sitio y al cargar las cajas de papel de computadora, que pesaban como 30 o 40 libras. Dejó de trabajar por los accidentes. Se reportó al Fondo cuando sintió dolor en el hombro, las manos se le adormecían y le corría el dolor hasta que le cogía el cuello. El Fondo le dio parafina, masajes, algunos ejercicios. Lo operaron de ambas manos por el Carpal Túnel bilateral. También le hicieron una artroscopía en ambos hombros.*

*También se lesionó ambas rodillas y salió en un MRI que tiene los meniscos rotos y lo enviaron a operar.*

*Sobre la espalda, el neurocirujano determinó que no era momento para operar, pues tenía que modificar su manera de vivir. Le dijo que no podía doblarse mucho ni hacer mucha fuerza porque podía quedarse en un sillón de ruedas. Su estatura es de 5'8 ½" más o menos y pesa 320 libras. Le dieron un bloqueo con anestesia para operarlo del hombro izquierdo y salió con hipersensibilidad en los dedos índice y pulgar (Neuritis). Eso hace que cuando le pasan el dedo es como si le pasaran un cuchillo y si cogía algo caliente lo sentía como si estuviera hirviendo. Actualmente se siente como si le dieran una carga de palo todos los días, mucho dolor en el cuerpo, en la espalda específicamente, en las piernas siento calambre y las manos han vuelto a adormecerse constantemente. Le da calambre hasta en la barriga, en el muslo por encima y por debajo contrayéndose la pierna. Puede estar sentado como 20 minutos al levantarse tiene que estirarse, las rodillas se le "estrellan", tiene como vidrio molido dentro. No puede levantar ni una botella de Pepsi Cola. Sólo puede caminar como media cuadra sin que se le traben los pies. Además de todo esto tiene diabetes y usa dos clases de insulina, una basal y otra para sustentar. Ello ha funcionado bien, aunque se siente cansado todo el día, le da sueño, dejadez. Está ganando peso, aunque no le da hambre, el médico le dice que tiene el metabolismo lento. Tiene controlada la hipertensión, siempre y cuando no pase un mal rato que se le trepa. Le da "stress" cuando lo obligan hacer algo que no quiere, que dé sus razones y por puro capricho lo ajoren. Por sus condiciones no puede hacer las cosas rápido, tiene que ir a su paso. También se trata de los nervios, por las noches oye voces que lo llaman, se despierta y no hay nadie, cuando está en la sala ve celajes y no hay nada, le da sentimiento, como ganas de llorar sin razón, se mete a la ducha y llora lo que vaya a llorar. Se despierta constantemente. No tiene mucha relación con la gente. Para sus necesidades básicas su mamá lo ayuda, lo lava de las rodillas para abajo y la espalda, pues no puede doblarse. No tiene mucha concentración, pues cuando ve televisión se olvida de la trama, la música pierde interés y la deja de oír. Durante el día se pasa en la cama. Se trata con la Dra. Carmen Álvarez, Psiquiatra. Sobre su memoria dice que se acuerda de muchas cosas y otras las ha querido borrar, los eventos malos como la muerte de su papá, de su hermana que murió de SIDA, de su sobrino que murió de SIDA y de su hijo que lo mató un carro. El doctor Padilla, Geriatra, es quien lo atiende para la diabetes, hipertensión, le receta los anti-inflamatorios y relajantes musculares. Lo ve bimensual. Luego del último accidente no volvió a trabajar. No pidió acomodo razonable.*

Además del testimonio del Recurrente, la Junta consideró extensa prueba pericial documental, que incluyó evaluaciones médicas y resultados de pruebas de laboratorio. Entre las pruebas objetivas realizadas al Recurrente se encuentran los siguientes:

*"a. MRI del área cervical del 11 de octubre de 1999.*

*b. MRI del hombro izquierdo del 27 de octubre de 1999.*

*c. EMG con velocidad de conducción sensorial y motora del 7 de octubre de 1999.*

*d. Informe radiográfico del área lumbar con fecha de 10 de enero de 2001.*

*e. MRI de la rodilla izquierda del 11 de enero de 2001.*

*f. MRI del área lumbar del 19 de enero de 2001.*

*g. MRI de la rodilla derecha del 30 de octubre de 2001.*

*h. Informe radiológico de la rodilla izquierda del 31 de octubre de 2001.*

*i. Informe radiográfico del 20 de octubre de 2004.*

*j. MRI del hombro derecho del 16 de noviembre de 2004.*

*k. MRI de ambas rodillas del 19 de julio de 2005.*

*l. Informe radiográfico del 19 de julio de 2005.*

*m. Reporte patológico de la rodilla izquierda del 30 de agosto de 2005. "*

Entre la diversa prueba documental examinada por la Junta se encuentra la siguiente:

*"1. Copias de los expedientes médicos de los casos del Fondo del Seguro del Estado: 00-64-01753-0, 01-64-03482-6.*

*2. Copia de expediente de tratamiento en el Centro de Cuidado Geriátrico, del 23 de noviembre de 2005.*

*3. Notas de progreso del Dr. Francisco Carlo, del 21 de marzo de 2000.*

*4. Informe Médico Especial por el Dr. Francisco Carlo, del 1 de mayo de 2000.*

*5. Informe Médico Solicitud de Pensión del 3 de mayo de 2001, Dra. Envida Torres Vélez.*

*6. Informe Médico Especial por la Dr(a). Betancourt, Sec. Médico Legal, del 21 de junio de 2001.*

*7. Informe Psiquiátrico del Dr. José Vázquez Sotomayor, del 14 de agosto de 2001.*

*8. Cuestionario de Diabetes, Dr. Néstor Pérez, del 9 de octubre de 2001.*

*9. Informe del Dr. César Cintrón Valle, Cirujano Ortopeda, del 18 de febrero de 2002.*

*10. Informe Psiquiátrico del Dr. Manuel E. López Cruz, del 13 de marzo de 2002.*

*11. Revisión Médica del expediente por la Dra. Yarima Marcucci Ramos, del 11 de abril de 2002.*

*12. Revisión Médica del expediente por el Dr. Alfredo Hurtado de Mendoza, Asesor Médico Psiquiatra, del 24 de abril de 2002.*

*13. Evaluación Psiquiátrica por el Dr. José Vázquez Sotomayor, del 12 de mayo de 2002.*

*14. Informe Pericial por la Dra. Leticia Ubiñas López, Psiquiatra, del 6 de febrero de 2004.*

*15. Evaluación Psiquiátrica por el Dr. José Vázquez Sotomayor, del 19 de mayo de 2004.*

*16. Revisión Médica del expediente por el Dr. Vicente Sánchez Quiles, Asesor Médico, del 11 de agosto de 2005.*

*17. Revisión Médica del expediente por el Dr. Ramón Nevares Font, Asesor Médico, del 15 de agosto de 2005.*

*18. Reporte de Operación de la rodilla derecha del 13 de diciembre de 2005.*

*19. Informe sobre evaluación psiquiátrica por la Dra. Carmen M. Álvarez Rondón, Psiquiatra.*

*20. Revisión Médica del expediente por el Dr. Vicente Sánchez Quiles, Asesor Médico, del 29 de agosto de 2006.*

*21. Revisión Médica del expediente por el Dr. Rafael Miguez Balseiro, Psiquiatra y Asesor Médico, del 25 de septiembre de 2006.*

*22. Informe de la Dra. Carmen Álvarez, Psiquiatra, del 4 de octubre de 2006."*

Finalmente cabe resaltar que la Junta también consideró la decisión de la Administración del Seguro Social del 22 de enero de 2003, que le aprobó al Recurrente una pensión por incapacidad.

## III

El Sistema de Retiro para los Empleados del Gobierno y la Judicatura de Puerto Rico se rige por la Ley Núm. 447 de 15 de mayo de 1951, según enmendada, 3 L.P.R.A. sec. 761 *et. seq.* Esta legislación establece las circunstancias bajo las cuales un participante del sistema puede ser acreedor a los beneficios de una incapacidad ocupacional o no ocupacional.

El artículo que de la Ley 447, *supra*, establece lo pertinente para la concesión de una incapacidad ocupacional a un participante del sistema:

*"Todo participante que, como resultado de una incapacidad que se origine por causa del empleo y surja en el curso del mismo, quedare incapacitado para el servicio, tendrá derecho a recibir una anualidad por incapacidad ocupacional siempre que:*

*(a) Se recibiere suficiente prueba médica en cuanto a la incapacidad mental o física del participante conforme a los criterios que mediante reglamento fije el Administrador.*

*(b) El participante o patrono, de acuerdo con los reglamentos de la Junta, notifique al Administrador con respecto a dicha incapacidad.*

*(c) Que el Fondo del Seguro del Estado determine que el accidente o enfermedad provino de cualquier función del trabajo o que sea inherentemente relacionado al trabajo o empleo.*

*(d) El participante tendrá que radicar la solicitud, sustentada con suficiente prueba médica, dentro de los ciento ochenta (180) días en que se relacione la condición por la cual radica su solicitud."* [3]

3 L.P.R.A. sec. 769.

El Artículo 10 regula lo relativo a la pensión por incapacidad no ocupacional y dispone en lo pertinente:

*"Todo participante que, teniendo por lo menos 10 años de servicios acreditados, se inhabilitare para el servicio, debido a un estado mental o físico y que por razón de ese estado estuviere incapacitado para cumplir los deberes de cualquier cargo que en el servicio del patrono se le hubiere asignado, tendrá derecho a una anualidad por incapacidad no ocupacional. El retiro del participante tendrá lugar a petición o solicitud suya o a petición del jefe de su departamento u oficina, mientras esté en servicio el mencionado participante, y de acuerdo con las reglas sobre anualidades por incapacidad provistas en el Artículo 11 de esta ley."* 3 L.P.R.A. sec. 770.

Por su parte, el Artículo 11 establece que para los fines de una anualidad por incapacidad ocupacional o no ocupacional, se considerará incapacitado a un participante **cuando la incapacidad esté sustentada con**

**suficiente prueba médica** conforme a los criterios que mediante reglamento fije el Administrador y **dicha prueba revele que el participante está imposibilitado para cumplir los deberes de cualquier cargo** que en el servicio del patrono se le hubiere asignado. 3 L.P.R.A. sec. 771. La determinación de incapacidad al amparo de la Ley Núm. 447, *supra*, debe limitarse a evaluar si la incapacidad del solicitante es tal que le impide realizar las funciones de su empleo o de cualquier otro trabajo remunerativo. Por lo que bajo el estatuto se considerará capacitado al empleado si no está total y permanentemente imposibilitado para cumplir los deberes de cualquier cargo que su patrono le hubiese asignado para trabajar en cualquier empleo retribuido, con un sueldo o retribución por lo menos igual a la que está recibiendo, a la luz de su edad, educación y experiencia de trabajo. De modo tal, que una incapacidad leve, que limite las funciones de su trabajo o de cualquier otro empleo remunerativo, no da base para recibir una pensión bajo el estatuto. *Padín Medina v. Adm. de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura*, **2007 J.T.S. 151**.

Por su parte, el Reglamento General para la Concesión de Pensiones por Incapacidad a los Participantes de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura, **[4]** vigente al momento de la solicitud, establece en la Regla 24 cuáles son los requisitos necesarios para solicitar una pensión por incapacidad ocupacional. Éstos son:

*"Regla 24. Pensiones por Incapacidad Ocupacional*

*24.1 Todo participante que quedase incapacitado para el servicio como resultado de una incapacidad que se origine por causa y en el curso del empleo, tendrá derecho a recibir una anualidad por incapacidad ocupacional.*

*24.2- Para tener derecho a una pensión por incapacidad ocupacional deberá cumplirse con los siguientes requisitos:*

*(a) que el participante esté en servicio activo a la fecha de radicación de la solicitud;*

*(b) **que se reciba suficiente prueba médica en cuanto a la incapacidad mental o física del participante;***

*(c) que el Fondo del Seguro del Estado haya determinado que la condición incapacitante está relacionada con el empleo del participante y es compensable;*

*(d) que el participarte o su patrono notifique dicha incapacidad por escrito al Administrador, dentro de los seis meses contados a partir de la fecha de la notificación de la última decisión institucional del Fondo del Seguro del Estado. Para los efectos de esta Regla, una cesantía, involuntaria no incluirá casos en que medie destitución, expulsión, acción disciplinaria o renuncia del participante."* (Énfasis Suplido)

La Regla 25 del Reglamento a su vez regula lo concerniente a la concesión de pensión por incapacidad no ocupacional y establece los requisitos para ser acreedor de la misma:

*"Regla 25.Pensiones por Incapacidad no Ocupacional*

*25.1- Todo participante que **se inhabilite total y permanentemente** para el servicio por causas no relacionadas con el empleo, tendrá derecho a solicitar una anualidad por incapacidad no ocupacional.*

*25.3- Para tener derecho a una pensión por incapacidad no ocupacional, el participante deberá cumplir con los siguientes requisitos:*

*(a) tener por los menos diez (10) años de servicios acreditables;*

*(b) estar en servicio activo a la fecha de radicación de la solicitud;*

*(c) que la incapacidad física o mental no haya sido provocada por hábitos viciosos, intemperancia o mala conducta;*

*(d) que se reciba suficiente prueba de la incapacidad del participante, que demuestre que está incapacitado total y permanentemente para cumplir con los deberes de cualquier cargo en el servicio del patrono se le hubiese asignado o para trabajar en cualquier clase de empleo retribuido, por lo menos con una retribución igual a la que tenía derecho a estar percibiendo estando en servicio activo."* (Énfasis Suplido)

La jurisprudencia ha establecido claramente que las leyes con propósitos remediales, como lo son las pensiones de retiro de empleados públicos, deben interpretarse liberalmente a favor del beneficiario. Pero, también ha reconocido que la incapacidad que obligue al retiro del empleado público debe ser de tal naturaleza que le inhabilite para desempeñar las funciones de su empleo y cualquier otro empleo remunerativo. *Sanfiorenzo Zaragoza v. Administración,* 138 D.P.R. 94 (1995). Por lo que una incapacidad que limita las funciones de un empleado, pero que no le impide llevar a cabo las funciones de su trabajo o de cualquier otro empleo remunerativo, no da base para recibir una pensión bajo la referida ley. *Sánchez v. A.S.R.E.G.J.,* 116 D.P. R. 372 (1985).

De conformidad con la Ley Núm. 447, *supra,* y el Reglamento, le corresponde al participante que solicita la pensión demostrar con suficiente evidencia que tiene una incapacidad total y permanente que lo inhabilita para cumplir los deberes de su puesto o cualquier otro empleo remunerativo. Hecha la solicitud por el empleado, le compete entonces a la Administración de los Sistemas de Retiro evaluar los criterios fijados por su reglamento, ponderar la prueba presentada en su totalidad y determinar si el solicitante cumple los criterios. *Padín Medina v. Adm. de los Sistemas de Retiro de los Empleados del Gobierno y la Judicatura, supra.*

En este aspecto habrá de imperar la norma jurisprudencial de deferencia a los organismos administrativos en sus interpretaciones de las leyes que tienen a su cargo poner en vigor, ya que éstos cuentan con la experiencia y conocimiento especializado en relación con la materia con la cual trabajan diariamente. *Rivera Concepción v. A.R.P.E.,* 152 D.P.R. 116 (2000). Su interpretación no será alterada a menos que se demuestre que la agencia actuó arbitraria o ilegalmente o en forma tan irrazonable que su actuación constituyó un abuso de discreción. *Murphy Bernabé v. Tribunal Superior,* 103 D.P.R. 692-699 (1975).

Sobre el alcance de la revisión judicial, la Sec. 4.5 de la Ley de Procedimiento Administrativo y Uniforme Núm. 170 del 12 de agosto de 1988, dispone que las determinaciones de hechos de las decisiones de las agencias serán sostenidas por el Tribunal si se basan en evidencia sustancial que obra en el expediente administrativo. 3 L.P.R.A. sec. 2175. Según ha indicado el Tribunal Supremo, evidencia sustancial *"es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión."* *Hilton Hotels v. Junta Salario Mínimo,* 74 D.P.R. 670, 687 (1953); *Otero Mercado v. Toyota de P.R. Corp., supra.*

El propósito de la anterior regla es evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor. *Reyes Salcedo v. Policía de Puerto Rico,* 143 D.P.R. 85, 95, (1997). Para convencer al Tribunal que no hay evidencia sustancial, la parte afectada, en este caso el Recurrente, debe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. Inclusive, el Tribunal debe sostener la resolución de un conflicto probatorio por parte de la agencia, siempre que ésta se haya apoyado en una base racional. *Misión Ind. P.R. v. Junta de Planificación,* 146 D.P.R. 64, 131-132 (1998).

## IV

En esencia, la controversia planteada en este caso es si debe sostenerse la decisión de la Junta al confirmar al Administrador y denegar al Recurrente los beneficios de incapacidad ocupacional y no ocupacional. No hay duda de las diversas condiciones de salud que padece el Recurrente, pero nos corresponde evaluar si la decisión recurrida está sostenida por evidencia sustancial, esto es, evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión.

El aspecto emocional del Recurrente es el de mayor gravedad y fue objeto de múltiples evaluaciones por diversos facultativos. De la Resolución de la Junta se desprenden las siguientes:

*"Informe Dr. Betancourt*

*Que el examen MMPI-2 fue inválido*

*Junio 2001 y no. permitió establecer un diagnóstico, concluyendo que había exageración de síntomas, por lo cual no era un caso real de trastorno mental.*

*Informe Dr. Vázquez Sotomayor*

*Agosto 2001 Depresión mayor con rasgos psicóticos. No está mentalmente competente para llevar a cabo ningún trabajo y no lo podrá lograr.*

*Discusión 2001 La impresión diagnóstica fue de Depresión Mayor Severa con rasgos psicóticos. En sus conclusiones dice que el apelante tiene poca tolerancia a la frustración y pobre capacidad para resolver problemas dentro y afuera de su hogar. Se molesta con bastante frecuencia tanto con vecinos y familiares. No conduce, le proveen transportación familiares o amigos, no hace tareas en el hogar, no utiliza el teléfono, a veces ve televisión y no se envuelve en actividades físicas.*

*Discusión mayo 2004 La impresión diagnóstica fue de "Severe Mayor Depresión with Psychotic Features". Sigue describiendo las limitaciones del Recurrente como sus restricciones en la vida diaria y peligro de descompensación en el trabajo. A la vez dice que la capacidad intelectual del Recurrente no se ha vista afectada. Luego se concluye lo siguiente: "Reinaldo was introduced in our office because he was showing psychiatric symptoms from years ago. They have been accelerating constantly with his physical illness and stress which has disabled the patient totally in order to perform any kind of labor. Reinaldo does not like to socialize with others. The patient is constantly in a depressive and anxious mood. He does not drive due to his anxiety. At this time, Reinaldo does not tolerate his conditions of stress, since it will turn the patient to a psychiatric crisis, depression and worsen his condition. The patient is being seen monthly in psychotherapy. Reinaldo is a person that has wanted all times continues to work although his illness does not allow his to. A significant remission of their symptoms is remote. **Reinaldo is not mentally competent to carry out any kind of task and will not be able to achieve it. He needs to continue in psychotherapy for the remanding of his lifetime." Su pronóstico es "Poor".***

*Dra. López Cruz*

*Marzo 2002 En el examen mental se describe al Recurrente como que representa su edad cronológica, bien desarrollado y obeso, caminar lento con bastón de madera, se sentó bien, limpio, bien vestido con barba y bigote. Usó gorra todo el tiempo y su expresión fue de tristeza. En contacto con la realidad, cooperador y produce al estímulo de preguntas en forma espontánea. Su tono de voz fue normal y el flujo tendió a ser rápido. No asociaciones laxas, bloqueos ni tics. En el contenido de pensamiento no hubo manerismos, ha tenido ideas suicidas y homicidas y que una vez tomó pastillas en exceso. A veces oye voces que lo llaman, pero no alucina*

238

*en la sesión. **Su afecto fue apropiado y su estado de ánimo fue depresivo.** Orientado en persona y lugar y parcialmente orientado en tiempo. Flujo del pensamiento tiende a ser rápido. No hay trastornos en la producción del pensamiento, que es lógico, coherente y relevante. Dice que en una ocasión tomó pastillas en exceso con ideas suicidas. No alucina durante la entrevista. Afecto apropiado, mood depresivo. Orientado en persona y lugar y en tiempo parcialmente orientado. Su memoria global (inmediata, reciente y remota) estuvo conservada. El juicio y la intromisión fueron aceptables. Se distrajo durante el examen y a veces se percibía "lejano". Se mantiene socialmente aislado. Guía su automóvil en distancias cortas. Va con la esposa a la playa y se mete al agua. La impresión diagnóstica fue de: **Depresión Mayor con rasgos psicóticos secundaria a condiciones físicas crónicas.***

Dra. Ubiñas López

*Febrero 2004   En el examen mental se describe al Recurrente como de estatura promedio, sobrepeso, vestimenta casual, caminando con asistencia de bastón, barba y bigotes desaliñados y se observó cierto "engatillamiento" de los dedos de la mano. Fue cooperador, tristeza, haciendo esfuerzo por no llorar en la entrevista, su afecto fue apropiado al contenido del pensamiento, en su lenguaje, se describe su tono triste, flujo lento y volumen bajo con suspiros frecuentes. Su actividad psicomotora fue lenta. Sobre su pensamiento, relató su historia de manera lógica, coherente y relevante. Se volvió ansioso cuando se exploró su vida sexual conyugal. Refiere limitaciones físicas. Sobre la percepción, dice que tiene alucinaciones visuales: refiere ver celajes y auditivas, escucha que lo llaman. Tiene quejas somáticas múltiples, expresa sentimientos de minusvalía e invalidez. Refiere que a veces tiene pensamientos suicidas. "No sé si lo haría. Me siento como una carga para los demás." Negó ideas homicidas. Ligeramente desorientado en tiempo. Concentración y atención disminuidas. Función intelectual concuerda con su escolaridad. Memoria a corto plazo afectada acorde con su estado psicomotor anímico. Juicio e introvisión adecuado. El diagnóstico fue de Desorden Distímico. Da un pronóstico reservado.*

Dra. Álvarez

*Abril 2006  Se describe al Recurrente **como alerta, cooperador, no tics, no manerismos, no trastornos en la marcha, expresión facial- lloroso, ansioso, preocupado con expresiones como "estoy desesperado". Su afecto congruente con el pensamiento, su estado de ánimo fue de tristeza. Su pensamiento fue lógico, coherente y relevante.** Negó ideas suicidas u homicidas. Dice que escucha voces que lo llaman. Orientado en las tres esferas, su memoria preservada y su juicio e introvisión fue bueno. Durante las evaluaciones el comportamiento del Recurrente lo describen con un cuadro depresivo, acompañado por cambios en el estado de ánimo, con períodos de irritabilidad, coraje, mal humor y bajísima autoestima. Paciente con un gran deterioro a nivel físico y emocional, que lo han llevado a estar cada día más alejado, aislado en sus relaciones interpersonales, por lo cual se siente solo, con bajísima autoestima y un descontrol continuo en sus estados anímicos, que provocan que se encuentre en tratamiento farmacológico. Los diagnósticos identificados fueron: Eje I, Depresión Mayor Severa Recurrente con rasgos psicóticos, Trastorno Mayor Severo Generalizado.*

*Octubre 2006   **Refiere que no hay historial de hospitalizaciones**, pero tampoco ha tenido remisiones de síntomas. Por sus estados de ánimos, no ha podido ayudar a su mamá ni a su abuela. No puede trabajar porque no puede interaccionarse con gente, con sus supervisores y jefes, pues no puede trabajar con estrés. En el examen mental se describe al Recurrente como alerta, cooperador, expresión facial ansiosa, triste y preocupada. Su pensamiento fue lógico, coherente y relevante. No tiene ideas suicidas u homicidas. Indica que tiene períodos de alucinaciones en ocasiones, de tipo visual. Afecto congruente con el pensamiento. Su estado de ánimo fue de tristeza, ansiedad y preocupación. Orientado en persona y lugar pero en tiempo está menoscabada. Su memoria inmediata, reciente y remota están preservadas. Se le hace difícil llevar a cabo cuentas y realizar tareas rutinarias. Su juicio es bueno, su introvisión es superficial. La atención y concentración están disminuidas. El diagnóstico es de Trastorno depresión mayor severa recurrente con rasgos*

*psicóticos. Trastorno de ansiedad generalizada.*

*Dr. Miguez Balseiro*

*Septiembre 2006    El doctor Miguez hace un recuento de la evidencia médica que consideró para el informe y discute el informe que hizo el Dr. Ramón Nevares del 15 de agosto de 2005. Indica que el doctor Nevares "entendió que la **condición emocional no alcanza ni iguala severidad necesaria para cumplir con los requisitos del listado 12.03, 12.04 o 12.06**. Listado 12.03 son condiciones de esquizofrenia paranoia y los trastornos psicóticos, tienen sección A, síntomas sección B, restricciones del diario vivir, dificultades para marcadas para mantener funcionamiento social o para mantener concentración, persistencia; episodios repetidos de duración prolongada y sección C página 81-82 el manual para la evaluación de incapacidad. Listado 12.04 son trastornos afectivos (depresivos) con secciones A1, B1, 2, 3 páginas 82, 83 y 84 del mismo manual. Listado 12.06 trastornos relacionados con la ansiedad nivel de severidad sección A y B o cuando se satisfacen los criterios A y C, páginas 85, 86. Recalcó que la disposición del Dr. Nevares en este caso se tomó con relación a los listados y por su opinión como perito psiquiátrico (asesor)".*

A los fines de evaluar una solicitud de incapacidad, la Administración utiliza un listado de criterios médicos que contienen el grado de severidad o de hallazgos médicos requeridos para determinar si una condición resulta incapacitante. En el caso del Recurrente se utilizaron los listados 11.3, 11.4 y 11.06 para evaluar si existía una condición mental incapacitante. [5]

Aunque la Junta reconoce que el Recurrente padece de un desorden depresivo, señala que éste no ha demostrado que su condición lo incapacite de conformidad con los listados médicos aplicables. La Junta concluyó que el Recurrente no ha tenido un comportamiento catatónico ni desorganizado; siempre ha tenido conocimiento de su ambiente, sus actos y consecuencias. A pesar de que el Recurrente ha tenido momentos difíciles en su vida y ha padecido de depresión, no han sido situaciones que lo enajenen y que no permitan que reaccione de forma correcta ante distintas situaciones. No existe evidencia de descompensación por la que haya tenido que recurrir a una intervención más agresiva en el tratamiento, incluyendo una hospitalización.

También surge de muchas de las evaluaciones practicadas al Recurrente, que éste es quien relató y refirió con detalles todo su historial médico familiar y laboral. Estuvo alerta y cooperador, completó las evaluaciones sin ningún problema, lo que requiere esfuerzo, concentración, entendimiento y actitud para seguir instrucciones y estar orientado en las tres esferas (tiempo, espacio y lugar).

En relación a su condición física, la Junta utilizó los criterios médicos 1.05 C, 1.11, 1.12 y 1.13 para el sistema músculoesqueletal y los criterios médicos 10.08 y 10.14 para la evaluación del sistema neurólogo. Sobre el particular, la Junta señaló que el Recurrente fue evaluado por diversos médicos y de dichas evaluaciones no surge que tenga deficiencia neurológica, tal como lo requiere los listados de criterios médicos utilizados para las condiciones vertebrogénicas.

En cuanto a la condición física, la Junta resalta el informe ortopédico del Dr. César Cintrón Valle, de donde surge que el Recurrente no tiene grandes limitaciones en los distintos movimientos de sus extremidades inferiores. Que éste pudo caminar, su marcha fue normal, pudo vestirse y desvestirse estando de pie, evidenciando que sus extremidades pudieron sostenerlo y tener equilibrio para ello. También pudo caminar en punta y talón y pudo ponerse de cuclillas. Con relación a sus extremidades superiores, no se encontró atrofia, pudo hacer pinza, oponer el pulgar y hacer puño con fuerza excelente. La marcha del Recurrente se describe en algunos informes como lenta y en otros que utiliza el bastón; no hay anormalidades en los reflejos. Se señala que en relación al síndrome del túnel carpiano bilateral no hay déficit sensorial ni que se han afectado los movimientos manipulativos gruesos y finos. El Recurrente completó todos los movimientos con todos sus dedos y manos, no hubo atrofia, lo cual significa el uso continuo de dichas extremidades; y su fuerza fue excelente.

En cuanto a la condición de hipertensión arterial relacionada al sistema cardiovascular, señala la Junta que de las diversas lecturas de la presión arterial al momento de las evaluaciones han estado dentro de los límites normales de una persona con dicha condición. Que de la evidencia surge que a pesar de que el Recurrente ha tenido que variar medicamentos, la presión arterial está controlada y no ha dañado órganos.

Sobre el diagnóstico de obesidad y diabetes del Recurrente, la Junta indica que la condición de éste no tiene las consecuencias físicas que disponen los criterios médicos como la desorganización significativa y persistente de su función motora en dos extremidades. Surge de algunas evaluaciones que su caminar y postura son normales y que sus manos tenían las funciones manipulativas completas y sin limitaciones. En cuanto a la condición de obesidad, surge de la evidencia que el Recurrente mide aproximadamente 5' 8"–5' 8½" y pesa de 300–320 libras. Señala la Junta que la obesidad por sí sola no tiene ningún efecto de incapacidad, que son las consecuencias de dicha condición. Que de las evaluaciones no surge que el Recurrente tenga una limitación significativa, pues sus movimientos su caminar es generalmente normal y no es incapacitante.

Como indicamos al inicio, en este caso se presentó mucha evidencia médica sobre las condiciones del Recurrente. En algunos de los informes hay coincidencias en cuanto a elementos fácticos de las condiciones del Recurrente y en otros hay conflictos. Igual sucede con los diversos diagnósticos.

En particular, la prueba sobre la condición mental del Recurrente es la que presenta mayor conflicto. Por un lado, la Junta entiende que su condición mental no lo incapacita y por otro lado, hay suficiente evidencia en el record según algunos peritos que entienden que no puede trabajar por su condición de depresión. Este conflicto nos lleva a las siguientes interrogantes, si a pesar de los criterios médicos que utiliza la Junta, una persona con un cuadro evidenciado de depresión mayor como el Recurrente, pertenece a un ambiente laboral donde se requiere interacción con otras personas. Segundo, si la condición de salud mental del Recurrente no cumple con los criterios de la Junta, cómo sabemos qué labores dentro de las funciones esenciales de su puesto puede efectuar.

Es en el último aspecto que la decisión de la Junta adolece de unas determinaciones específicas que permita validar su decisión. De ordinario, cada empleado en el servicio público debe tener un cuestionario de clasificación que debe ser validado por su superior y jefe de dependencia, donde se especifican las funciones del puesto y el período de tiempo que se dedica a ellas. A su vez, dicho documento debe estar en armonía con las especificaciones del puesto o su hoja de deberes. La determinación de incapacidad, aunque en principio va a estar ponderada en función de criterios médicos, la decisión no puede hacer abstracción de las funciones del puesto del solicitante. Lo contrario sería una decisión en el vacío y que entonces no sería razonable, pues la determinación de que una persona no está incapacitada **equivale** a que está apta para trabajar en las funciones de su puesto. La interrogante en última instancia es, si con las limitaciones físicas y de salud mental del Recurrente, puede éste realizar sustancialmente las tareas y responsabilidades reales de su puesto o de otro similar que le asigne el patrono. Esa interrogante queda inconclusa de las determinaciones de la Junta.

Sobre la importancia de formular de forma completa las determinaciones de hechos y conclusiones de derecho en el proceso de revisión judicial de decisiones administrativas, se ha resaltado lo siguiente:

*"Consignar adecuadamente determinaciones de hechos y conclusiones de derecho permite que: (1) los tribunales tengan la oportunidad de revisar adecuadamente la determinación administrativa ante su consideración; (2) fomenta que los organismos administrativos adopten decisiones cuidadosas y razonadas conforme el ámbito de su autoridad y discreción; (3) ayudan a la parte afectada a entender la razón de la determinación administrativa, permitiendo así que ésta decida si solicita o no su revisión ante el foro apelativo correspondiente o si, de lo contrario, acata la misma; (4) promueve la uniformidad intraagencial, en particular cuando el proceso decisorio institucional es adoptado por distintos miembros de un comité especial a quienes les está encomendado celebrar vistas y recibir la prueba; (5) evita que los tribunales usurpen funciones propias*

*de las agencias administrativas, dado su conocimiento o expertise." Empresas Ferrer, Inc., v. ARPE,* **2007 J.T. S. 181**; *Mun. de San Juan v. J.P.,* **2006 J.T.S. 164**.

A los fines de evaluar correctamente la determinación de la Junta, se deja sin efecto su decisión y se devuelve el caso ante su consideración para que se formulen determinaciones adicionales sobre la capacidad total o parcial del Recurrente de efectuar las funciones y deberes de su cargo ante la realidad de su condición de salud. De ser necesaria la celebración de una nueva vista limitada a este aspecto, así deberá disponerse.

## V

Por los fundamentos antes expuestos, se revoca la Resolución recurrida y se devuelve a la consideración de la Junta de Síndicos de la Administración de Sistemas de Retiro de los Empleados del Gobierno y la Judicatura del Estado Libre Asociado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones

**ESCOLIOS 2008 DTA 89**

**1.** Véase Anejo I, Recurso de Revisión, pág. 1.

**2.** Véase Anejo I, Recurso Revisión, pág. 2.

**3.** El inciso (d) fue suprimido por la Ley Núm. 296, de 15 de septiembre de 2004, que enmendó la Ley Núm. 447, *supra*.

**4.** Reglamento 4930 del 22 de abril de 1993. Éste fue sustituido por el Reglamento 6719 de 7 de noviembre de 2003.

**5.** 11.03 Esquizofrenia, Paranoia y otros trastornos psicóticos.

11.04 Trastornos Afectivos.

11.06 Trastornos relacionados a la ansiedad.